# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00252-SCT

*CHARLEAN TROUPE*

*v.*

*JAMES McAULEY, M.D., NORTH MISSISSIPPI MEDICAL CENTER, INC., NORTH MISSISSIPPI HEALTH SERVICES, INC., AND NORTH MISSISSIPPI SURGICAL CENTER, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/23/2006 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES H. ARNOLD |
| | JOHNNIE E. WALLS, JR. |
| | JIM DAVIS HULL |
| ATTORNEYS FOR APPELLEES: | JANELLE MARIE LOWREY |
| | ROBERT K. UPCHURCH |
| | JOHN G. WHEELER |
| | WILLIAM DANIEL PRESTAGE |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 05/10/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND DICKINSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     From the trial court's refusal to accept the plaintiff's expert medical witness, grant of a directed verdict against the plaintiff, and entry of a final judgment in favor of the medical providers in this medical malpractice case, the plaintiff , Charlean Troupe (Bradley), appeals

to us. Finding no reversible error, we affirm the final judgment entered by the Lee County Circuit Court.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. Charlean Troupe Bradley (Troupe)[1] was referred to Dr. James McAuley, a neuro-otolaryngologist,[2] by Dr. Harold Hudson, who was Dr. McAuley's partner. The referral to Dr. McAuley was for the purpose of reviewing what Dr. Hudson suspected was a glomus tympanicum, or a benign tumor, in Troupe's left middle ear. Dr. Hudson had performed a physical examination of Troupe and had ordered a Computerized Tomography Scan (CT Scan). Dr. McAuley then conducted a physical examination of Troupe's ear and ordered Magnetic Resonance Imaging (MRI) to be done. Based upon the information provided by the CT scan and MRI, Dr. McAuley concluded that Troupe did indeed have a glomus tympanicum and scheduled surgery.[3]

¶3. On March 1, 2001, Dr. McAuley performed surgery on Troupe's middle ear at North Mississippi Medical Center (NMMC) in Tupelo.[4] During the surgery, Dr. McAuley made

---

[1]Troupe's last name at the time of trial was Bradley.

[2]A neuro-otolaryngologist is a physician who has completed a five-year minimum residency training program in otolaryngology (ear, nose, and throat surgery) followed by advanced fellowship training in otology/neuro-otology. A neuro-otolaryngologist quite often will restrict his or her practice to problems relating to the ear.

[3]The CT Scan and the MRI showed the anatomy of Troupe's ear to be in a normal position. Dr. McAuley saw what he believed to be a tumor while looking into Troupe's ear during the physical examination.

[4]Troupe's surgery was conducted in NMMC's surgery unit, North Mississippi Surgical Unit, Inc.

contact with what he thought was a tumor. Instead, what was thought to be a tumor turned out to be a doubly anomalous carotid artery,[5] which he could not see on the CT scan and MRI that had been conducted. The artery tore, and because Dr. McAuley could not seal it with stitches, he used surgical packing to control the bleeding.

¶4. Immediately after surgery, Dr. Robert Becker (Dr. Becker), NMMC's interventional radiologist, then performed another CT Scan and an arteriogram on Troupe's ear. Dr. Becker confirmed that Dr. McAuley did not lift a tumor, but in fact lifted Troupe's carotid artery. Because Dr. Becker was going to be out of town the next day, Dr. McAuley arranged for Troupe to be transferred to the University of Alabama Hospital in Birmingham, Alabama (UABH), for treatment, because he wanted to make sure an interventional radiologist would be available if needed. Troupe was prescribed narcotics for pain by Dr. Ethel Beasley at North Mississippi Health Services, Inc. (NMHS),[6] prior to being transported from NMMC to UABH.

¶5. Upon her return home from UABH, Troupe was sent to Mississippi Methodist Rehabilitation Center (MMRC) in Jackson for therapy. While at MMRC, Troupe developed a movement disorder that physicians determined was not due to the injury to her artery but was instead due to a psychological problem. The record revealed the medical opinion was

---

[5]Dr. McAuley testified that he had never seen or read about a doubly anomalous carotid artery. He further testified that, in his training, based upon his physical examination of Troupe's ear, "the only thing it could be is a glomus tympanicum."

[6]NMHS is a unit of NMMC.

that Troupe's "pattern of apparent abnormal movements is not compatible with any neurologic disorder," but instead, "improvement with distraction is a strong indication that these are psychologically and not neurologically mediated."

¶6.     On June 4, 2001, Troupe filed her original complaint against Dr. McAuley, NMMC, Mississippi Methodist Rehabilitation Center Auxiliary, Inc. (MMRCA), and "John Doe Person(s)" and "John Doe Entity(ies)," in the Circuit Court for the First Judicial District of Hinds County.  On July 6, 2001, MMRCA filed a motion to dismiss based on a failure to state a claim and failure to sue the correct entity.[7]  On July 12, 2001, Dr. McAuley and NMMC filed a joint Motion for Change of Venue, or in the Alternative, to Sever and Change Venue.  On February 14, 2002, the Hinds County Circuit Court, Judge Swan Yerger, presiding, entered an Order Severing Claims and Transferring Venue, thereby transferring Troupe's severed claims against Dr. McAuley and NMMC to the Circuit Court of Lee County.[8]

---

[7]MMRCA's motion states: "The hospital where Plaintiff received rehabilitation treatment is owned and operated by The Mississippi Methodist Hospital and Rehabilitation Center, Inc. (Exhibit "C").  Mississippi Methodist Rehabilitation Center Auxiliary, Inc. is a separate corporation formed for the purpose of providing financial and spiritual support to the hospital and its patients. (Exhibit "D").  Mississippi Methodist Rehabilitation Center Auxiliary, Inc., does not own or operate the hospital to which Plaintiff was admitted on March 15, 2001."  Troupe filed a Motion to Amend the Complaint on July 30, 2001, to amend the name of the defendant, MMRCA, to Mississippi Methodist Rehabilitation Center, Inc.

[8]In Judge Yerger's order of February 14, 2002, the Hinds County Circuit Court retained the claims against Mississippi Methodist Rehabilitation Center Auxiliary, Inc. and Mississippi Methodist Rehabilitation Center, Inc., and transferred the claims against Dr. McAuley and NMMC to the Circuit Court of Lee County, which ultimately entered a final

¶7.     In her first amended complaint filed in the Lee County Circuit Court on December 23, 2002, Troupe added as party-defendants North Mississippi Health Services, Inc. (NMHS), North Mississippi Surgical Center, Inc. (NMSC),[9] Dr. Robert Becker, and Dr. Etha S. Beasley[10] as defendants. However, the trial judge eventually entered orders dismissing Dr. Becker and Dr. Beasley, with prejudice.

¶8.     On September 26, 2005, NMMC, NMHS, and NMSC filed a Motion to Strike Plaintiff's Designation of Expert Witnesses. This motion, asserted, *inter alia,* that Troupe's "formal designation of trial experts, dated September 6, 2005, was submitted less than the sixty (60) days required by Rule 4.04 of the Uniform Circuit and County Rules," inasmuch as the trial was scheduled to begin on October 31, 2005. On September 28, 2005, Dr. McAuley filed a Joinder of the Defendant, James McAuley, M.D., in Motion of North Mississippi Medical Center, Inc., et al., to Strike Plaintiff's Designation of Expert Witnesses. We find nothing in the record concerning the trial court's disposition of these motions.

¶9.     On October 31, 2005, and November 1, 2005, a jury trial was conducted in the Circuit Court of Lee County, Judge Thomas J. Gardner, III, presiding. Troupe commenced her

---

judgment on the claims asserted against Dr. McAuley, NMMC, and the other defendants added after the transfer to Lee County. Thus, Mississippi Methodist Rehabilitation Center Auxiliary, Inc., and Mississippi Methodist Rehabilitation Center, Inc., are not parties to this appeal.

[9]Because NMHS and NMSC are units of NMMC and were defended at trial as one entity by the same attorney, we will refer to these defendants collectively as NMMC.

[10]Dr. Beasley's first name is actually Ethel.

presentation of the evidence by calling Dr. McAuley as an adverse witness. Troupe then called Dr. Charles E. Rawlings to the witness stand in an effort to qualify him as an expert witness in the field of neurosurgery as opposed to otolaryngology or neuro-otolaryngology.

¶10. During his voir dire of Dr. Rawlings in an effort to qualify him as an expert, Troupe's attorney elicited from Dr. Rawlings before the jury, *inter alia*, that he was a physician, neurosurgeon and attorney; that he was board certified in neurosurgery, current on his continuing medical education, but he was not currently practicing neurosurgery; that he had a law degree from Wake Forest University; and that, as to Troupe's litigation, he had reviewed her medical records from NMMC and UABH. Troupe's attorney then asked Dr. Rawlings, "[b]ased upon your review of [Troupe's] records, medical records and your opinion to a reasonable degree of medical certainty, tell the jury what happened to [Troupe]." At this point, the attorneys for Dr. McAuley and NMMC objected, and Troupe's counsel then asked Judge Gardner to accept Dr. Rawlings as an expert in the specialty of *neurosurgery rather than otolaryngology or neuro-otolaryngology*. Judge Gardner put the jury in recess, and outside the presence of the jury, Troupe's counsel argued that Dr. Rawlings's testimony was acceptable because Dr. Rawlings had training in surgery, and because the doctor who treated Troupe at UABH was a neurologist. Outside the presence of the jury, Judge Gardner allowed Troupe's counsel to continue to attempt to qualify Dr. Rawlings as an expert in neuro-otolaryngology, and the following questioning occurred:

> Q.    Dr. Rawlings, are you trained in surgery in the head area?
> A.    Yes.

Q. Is it sometimes commonly referred to a neurosurgeon as a brain surgery (sic)?

A. It is.

Q. Okay. And are you competent to do any type of surgery involving the area of the brain and the internal organs of the head?

A. Neurosurgery is that part of the surgery that does procedures upon the head, the scalp, the skull, the covering of the brain, the brain and the arteries that lead to the brain.

Q. Okay. Would you be familiar with the left internal carotid artery?

A. I would be.

Q. And the other arteries communicating or surrounding, receiving blood off of that main artery and all of the vessels of the head, including those in and around the ear?

A. Yes, sir.

. . . .

Q. Doctor, you read the records, medical records concerning Charlean. Have you had experience, direct experience with things, cases involving the carotid artery and the matters concerning the vascular system about which we're here today in the case of Charlean Troupe Bradley?

A. Yes. I mean the neurosurgeons operate upon the carotid artery, and the case today is primarily about biopsying a normal carotid artery.

Q. How many such cases have you performed or been involved in involving the carotid artery and the items that would relate to the case that we're here about today?

A. It would be hard to put a number on them, but doing carotid endarterectomies and also clipping aneurisms you're dealing with the carotid artery yourself.

Q. Could you tell the Court what percentage of your practice dealt with that type surgery?

A. Intracranial procedures were about 30 to 40 percent.

[PLAINTIFF'S COUNSEL]:

May it please the Court, based upon Doctor Rawlings' testimony regarding his experience and training, we again offer him as an expert in this case.

7

¶11.    In refusing to accept Dr. Rawlings as an expert *in neuro-otolaryngology* where he was

tendered as an expert *in neurosurgery*, Judge Gardner stated, *inter alia*:

> The Court is of the opinion that the burden imposed on the Plaintiff in this case is to establish as to the defendant doctor in his particular field of specialty a standard of care which he owed to the Plaintiff in this case and to demonstrate – and that standard of care is because of where he is in the discipline that he is trained in.  It's not a general practitioner's standard, it's higher than that, and the voir dire or qualification, the attempt to qualify this witness doesn't even touch on that.
>
> Further, there must be some showing of some violation of that standard of care imposed on the doctor within the specialty that he pursues and that that in some way resulted in the damages or injuries sustained by the Plaintiff.
>
> To say that a neurosurgeon knows intuitively what the standard of care is as to Dr. McAuley or in any other discipline within the practice of medicine presupposes a whole lot of information that's not made clear here by his qualification and voir dire or your questions directed to him.  And as to the requirement that the Defendants participate in qualifying him by voir dire examination, I think that's ludicrous.[11]  They're certainly within their right to stand on the qualifications tendered and to not expand on that inadvertently or giving any further opportunity if they elect to do that.
>
> The opinion of the Court is that this witness is not competent to testify against Dr. McAuley in this case simply because he has not established by virtue of training or otherwise that he knows the standard of care, that he's familiar with that and can testify about how, if any, in any way that standard was breached and the causal connection.
>
> Now, the matters having to do with neurosurgery, I don't have any question but that he is a competent witness.  If you're going to question him concerning causation, violation of the standard or the standard itself, I think he is not qualified to testify about that.

---

[11]Troupe's attorney had argued to Judge Gardner that the attorneys for Dr. McAuley and NMMC, as a prerequisite to arguing that Dr. Rawlings was not qualified to testify as an expert, should have conducted voir dire of Dr. Rawlings upon his being tendered as an expert.

Now, if you wish to make a record, you may do so by proffer or by asking him questions.

¶12. Accepting this invitation from the trial judge, Troupe's attorney continued his questioning of Dr. Rawlings (again, outside the presence of the jury), in order to make his proffer for the record. During this proffer, Dr. Rawlings testified, to a reasonable degree of medical certainty, *inter alia*: that when Troupe presented to Dr. McAuley, she complained of dizziness and decreased hearing in her left ear; that the CT scan and MRI performed under the supervision of Dr. Hudson or Dr. McAuley were normal; that Dr. McAuley eventually discovered a mass behind Troupe's left eardrum, which he believed to be a benign vascular tumor; that based on this diagnosis, Dr. McAuley performed surgery, resulting in the tearing which damaged Troupe's left internal carotid artery, necessitating an occlusion of the left carotid artery; that during her hospitalization, Troupe had several episodes of hypotension resulting in a tremor disorder; that there was a breach of the standard of care in the inappropriate administration of morphine at NMMC prior to Troupe's transportation from NMMC to UABH; that the resulting hypoxia "more than likely damaged or at least physiologically changed, damaged her deep brain structures that subserve movement, in other words, coordination;" that Dr. McAuley specifically breached the standard of care to which Troupe was entitled "[b]y not ruling out the presence of an aberrant internal carotid artery and by upon the surgery lacerating or biopsying or tearing the aberrant internal carotid artery;" that Dr. McAuley breached the standard of care by not ruling out the presence of an aneurism or an aberrant artery upon his discovery of the reddish-bluish mass behind Troupe's

9

left eardrum; and, that Troupe's ultimate injury caused by Dr. McAuley's breach of the standard of care resulted in Troupe's movement disorder. The following colloquy then occurred between Troupe's counsel and Dr. Rawlings:

Q. Doctor, as a neurosurgeon would you be familiar with the damages to her deep brain structures? Is that a part of your training?
A. It is.
Q. Okay. Doctor, to a reasonable degree of medical certainty can hypoxia cause various types of movement disorders?
A. It can.
Q. And Doctor, based upon your medical knowledge and training to a reasonable degree of medical certainty can hypoxia cause progressively deteriorating movement disorders?
A. It could, yes.
Q. Okay. And would that explain why Mrs. Troupe had episodes of some clarity in her movement disorder after taking Mysoline and then ultimately the condition progressing to a point where Mysoline by itself would not alleviate her condition?
A. It's one possibility, yes.
Q. Okay. Doctor, are you saying to a reasonable degree of medical certainty that Dr. McAuley and the North Mississippi Medical Center violated the standard of medical care that was due Mrs. Troupe in her treatment?
A. In my opinion, yes.

¶13. Upon Dr. Rawlings being tendered by Troupe's attorney, the attorneys for Dr. McAuley and NMMC conducted their voir dire of Dr. Rawlings for the record. During defense counsels' voir dire, it was revealed: that Dr. Rawlings last performed surgery in December, 1999; that in March, 2001, when Troupe presented to Dr. McAuley, Dr. Rawlings, a neuro-surgeon, was a full-time law student, and as of July, 2001, he had relinquished all staff privileges at hospitals; that in 2002, Dr. Rawlings graduated from law school and was admitted to practice law in North Carolina, where he specialized in medical

10

negligence cases; that Dr. Rawlings had never pursued an otolaryngology residency or fellowship; that Dr. Rawlings was aware that Dr. McAuley had a fellowship in neuro-otolaryngology; and, that while on the medical staff at Forsyth Hospital in Winston-Salem, North Carolina, Dr. Rawlings never had privileges to perform middle ear surgery, because such privileges were reserved for physicians who specialized in otolaryngology.

¶14. Finally, upon further questioning by Troupe's attorney, Dr. Rawlings testified as follows:

> Q. Doctor, to a reasonable degree of medical certainty is it ever appropriate for a physician doing the type operation that Dr. McAuley or any other physician was doing or purported to do in his records to cut the carotid artery?
> A. No.
> Q. Is that always a breach of the standard of care?
> A. It is.
>
> . . . .
>
> Q. Doctor, would it be possible for a neurosurgeon to give an opinion as to the laceration of a carotid artery?
> [Objection by opposing counsel.]
> Q. Regardless of whether or not it was done by an ENT specialist or perhaps even a doctor with your specialty?
> [Objection overruled.]
> A. Yes.

¶15. Again, Judge Gardner refused to declare Dr. Rawlings as an expert to offer opinions before the jury as to Dr. McAuley's alleged breach of the standard of care owed to Troupe,

11

whereupon the attorney for Troupe then requested Judge Gardner to certify this issue to this Court via an interlocutory appeal, and Judge Gardner denied this request.[12]

¶16.    Upon Judge Gardner's disallowance of Dr. Rawlings's testimony, Troupe's counsel rested the plaintiff's case-in-chief.  The attorneys for Dr. McAuley and NMMC then moved for a directed verdict, which Judge Gardner granted.  Consistent with the grant of a directed verdict, Judge Gardner subsequently entered a final judgment in favor of Dr. McAuley and NMMC on November 10, 2005.  On November 14, 2005, Troupe filed a motion requesting the trial court to reconsider its ruling prohibiting Dr. Rawlings to testify as an expert witness pursuant to Miss. R. Evid. 702, and also requesting a new trial.  Judge Gardner denied these post-trial motions by order entered on January 23, 2006.  Troupe timely filed her notice of appeal on February 6, 2006.

## DISCUSSION

¶17.    There is but one critical issue for this Court to decide today. Charlean Troupe phrases the issue as follows: "The trial court erred in refusing to accept Dr. Rawlings as an expert on the standard of care on the basis that a neurosurgeon can not testify as to the standard of care owed by a neuro-otolaryngologist." NMMC asserts that "[t]he trial court herein acted well within its discretion in excluding the opinion testimony of Ms. Troupe's tendered expert,

_____

[12]Effective December 9, 2004, as to trial court orders entered from and after March 1, 2005, the provisions of Miss. R. App. P. 5(a) and 5(b) were amended to eliminate the requirement of seeking trial court certification of an interlocutory appeal to this Court. Since the trial of today's case occurred on October 31 and November 1, 2005, Troupe was not required to seek trial court certification of an interlocutory appeal to this Court. In any event, Troupe never sought relief from this Court via an interlocutory appeal.

12

Charles E. Rawlings, M.D., after finding that Dr. Rawlings failed to demonstrate education, training, or experience in the medical specialty of the health care provider defendants or knowledge of the applicable standards of care." Finally, Dr. McAuley presents to us that the trial court appropriately found that Dr. Rawlings was as a matter of law incapable, as "a neurosurgeon and lawyer," of offering an expert opinion as to the proper standard of care applicable to a neuro-otolaryngologist, and that the trial court (1) properly excluded the testimony of Dr. Rawlings, and thus correctly granted a directed verdict in favor of Dr. McAuley; and (2) properly refused to accept Dr. Rawlings as an expert, but that this refusal on the part of the trial court "was not based upon [Dr. Rawlings] being a neurosurgeon, but was based upon Dr. Rawlings not knowing the standard of care applicable to Dr. McAuley."

¶18. We thus rephrase the sole issue before us for clarity in discussion.

**WHETHER THE TRIAL COURT ERRED IN REFUSING TO ACCEPT DR. RAWLINGS, TENDERED AS AN EXPERT IN NEUROSURGERY, TO TESTIFY AS TO THE STANDARD OF CARE OWED BY A NEURO-OTOLARYNGOLOGIST.**

¶19. "The standard of review for the admission or suppression of evidence in Mississippi is abuse of discretion." *Poole v. Avara*, 908 So. 2d 716, 721 (Miss. 2005) (citing *Miss. Trans. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003)). "The trial judge has the sound discretion to admit or refuse expert testimony; an abuse of discretion standard means the judge's decision will stand unless the discretion he used is found to be arbitrary and clearly erroneous." *Id.* When considering a trial court's grant of a directed verdict, this Court's standard of review is de novo. *White v. Stewman*, 932 So. 2d 27, 32 (Miss. 2006).

13

¶20.    Troupe argues that the trial court refused to accept Dr. Rawlings as an expert witness simply because he was a neurosurgeon rather than an otolaryngologist or neuro-otolaryngologist. However, Dr. McAuley and NMMC argue that the trial court correctly refused to accept Dr. Rawlings as an expert witness because he lacked the requisite knowledge to testify as to the standard of care owed by a neuro-otolaryngologist *where he was tendered only as an expert in neurosurgery*.

¶21.    Miss. R. Evid. 702 (amended 2003) states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

¶22.    This Court recently had an occasion to once again address the issue of expert witness testimony in a medical malpractice setting. In ***Cheeks v. Bio-Medical Applications, Inc.***, 908 So. 2d 117 (Miss. 2005), this Court stated:

> To present a prima facie case of medical malpractice, a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care; and (3) establishing that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician's noncompliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's damages. ***McCaffrey v. Puckett***, 784 So. 2d 197, 206 (Miss. 2001) (citing ***Ladner v. Campbell***, 515 So. 2d 882, 887-88 (Miss. 1987)). A physician who is sufficiently "familiar with the standards of [a medical] specialty, [may testify as an expert, even] though he [does] not practice the specialty himself." ***West v. Sanders Clinic for Women, P.A.***, 661 So. 2d 714, 718-19 (Miss. 1995). "It is our general rule that in a medical malpractice action negligence cannot be

14

established without medical testimony that the defendant failed to use ordinary skill and care." ***Brooks v. Roberts***, 882 So. 2d 229, 232 (Miss. 2004) (citing ***Sheffield v. Goodwin***, 740 So. 2d 854, 858 (Miss. 1999)).

*Id.* at 120. Thus, this Court makes it clear that there is no per se rule that Dr. Rawlings had to be a neuro-otolaryngologist in order to be qualified to testify as an expert in the case *sub judice*. However, Dr. Rawlings had to demonstrate that he was sufficiently "familiar with the standards of" neuro-otolaryngology by knowledge, skill, experience, training, or education in accordance with Miss. R. Evid. 702.

¶23. Therefore, it is crucial to understand the factual basis for this Court's decision in ***Cheeks***, involving a medical negligence claim due to the death of a dialysis patient who suffered severe hemorrhaging at the site where a shunt for dialysis had been implanted. We quote here from ***Cheeks***:

> In order to testify, Dr. Myers, a family physician, must have been familiar with the standard of care to which a dialysis clinic, a nephrologist and a radiologist are held. ***McCaffrey***, 784 So. 2d at 203. Dr. Myers was not board certified in family practice or any other specialty; was not a member of the American Medical Association; was not on staff at any hospital and could not admit patients to any hospital; had no special training or experience in the field of nephrology; had never been inside a dialysis clinic in Mississippi; had never participated in a dialysis procedure; had never operated a dialysis machine; had never monitored a patient while he was receiving the actual dialysis treatment; relied on the expertise of a nephrologist when determining whether one of his patients was receiving the appropriate type of dialysis treatment or responding to the treatment as he should; had never inserted a gortex graft; had never seen a graft inserted into a patient; had never inserted a dialysis needle into a graft; had never inspected a graft which was implanted in a patient; had never recommended that a graft be replaced; was, by his own admission, not qualified to render opinions as to when or whether a graft should be replaced, because these medical opinions fall within a specialized area in which he had no experience or training; had never read any literature on the specific type of graft at issue; and did not know who manufactured the graft in question or the

15

manufacturer's recommendation as to the life of the graft. Dr. Myers further admitted that it was the job of a radiologist to determine whether a particular graft is functioning properly; that a radiologist inspected Henry's graft approximately 30 days prior to Henry's death and found it to be operating properly; and that he (Dr. Myers) could find nothing wrong with that radiologist's report.

*Id.*

¶24. Similarly, Dr. Rawlings was not qualified to testify against Dr. McAuley. Dr. Rawlings was not board certified in otolaryngology or neuro-otolaryngology; he was board certified in neurosurgery. He last performed surgery in December 1999. At the time of Troupe's surgery, Dr. Rawlings was not actively practicing medicine. Dr. Rawlings had no special training or experience in the field of otolaryngology or neuro-otolaryngology. He had never conducted middle ear surgery, had never had privileges at any hospital to conduct middle ear surgery, and was not qualified to conduct middle ear surgery. Dr. Rawlings did not hold himself out to be an expert in otolaryngology or neuro-otolaryngology. His curriculum vitae did not demonstrate any articles that he had written nor any presentations that he had given regarding otolaryngology or neuro-otolaryngology. Furthermore, Troupe tendered Dr. Rawlings as an expert in *neurosurgery*. Troupe's counsel repeatedly asked Dr. Rawlings about his qualifications concerning the carotid artery. Dr. McAuley was not conducting surgery on Troupe's *carotid artery*; he was conducting surgery on Troupe's *left middle ear*, as Dr. Rawlings admitted. Dr. Rawlings readily admitted that he had never performed middle ear surgery, because he never had privileges to perform middle ear surgery.

16

¶25.    We have consistently stated that when considering Miss. R. Evid. 702 issues, our trial judges are placed in the role of gatekeepers, "ensuring that expert testimony is both relevant and reliable." *Poole*, 908 So. 2d at 723 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238, 249 (1999)).  *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35 (Miss. 2003), wherein this Court adopted the rule laid down in *Daubert v. Merrell Dow Pharmaceuticals, Inc*. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[13]  In *Poole*, we likewise reiterated that "[t]he rule is that the expert must exercise the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  908 So. 2d at 724 (citing *McLemore*, 863 So. 2d at 37-38).

¶26.    With this in mind, and in remembering the proffer which was before the trial judge when he refused to accept Dr. Rawlings (a neurologist who had never performed middle ear surgery), as an expert to offer an opinion on the appropriate standard of care which Dr. McAuley (a neuro-otolaryngologist performing middle ear surgery) owed to his patient, Charlean Troupe, we are unquestionably compelled to find as a matter of well-established law that the trial judge did not abuse his discretion in excluding this opinion testimony on the part of Dr. Rawlings.

¶27.    The practical effect of Judge Gardner's ruling as to Dr. Rawlings was that Troupe was undeniably left with the inability to meet her burden of proof in this medical negligence case.

---

[13]Thus, in *McLemore*, this Court abandoned and "rejected" the standard laid down in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Circ. 1923).  *McLemore*, 863 So. 2d at 42-43.

17

Again, "`[i]t is our general rule that in a medical malpractice action negligence cannot be established without medical testimony that the defendant failed to use ordinary skill and care.' *Brooks v. Roberts*, 882 So. 2d 229, 232 (Miss. 2004) (citing *Sheffield v. Goodwin*, 740 So. 2d 854, 858 (Miss. 1999))." *Cheeks*, 908 So. 2d at 120. Without expert medical testimony, Troupe was unable to carry her required burden of proof in this medical malpractice case.

¶28. We recently once again discussed our solemn responsibility in reviewing a trial judge's grant or denial of a motion for a directed verdict. In conducting such a review, we "must decide whether the facts presented, together with any reasonable inferences, considered in the light most favorable to the nonmoving party, point so overwhelmingly in favor of the movant that reasonable jurors could not have returned a verdict for the plaintiff." *Robley v. Blue Cross/Blue Shield*, 935 So. 2d 990, 996 (Miss. 2006) (citing *Drennan v. Kroger Co.*, 672 So. 2d 1168, 1170 (Miss. 1996)). Therefore, in applying a *de novo* standard of review as to the trial judge's grant of a directed verdict in favor of Dr. McAuley and NMMC, we find that the trial judge did not err in directing a verdict in favor of these defendants. Clearly, without the testimony of Dr. Rawlings, when considering all the evidence offered during the plaintiff's case-in-chief, as well as all reasonable inferences which could be drawn from the evidence, all in the light most favorable to the plaintiff, the plaintiff was unable to make out a prima facie case sufficient to require the defendants to go forward with their proof.

¶29. Consistent with our discussion of this issue, we reach the inescapable conclusion that this issue is without merit.

## CONCLUSION

¶30. Serving as the gatekeeper of Rule 702 opinion testimony, the trial judge did not abuse his discretion in disallowing the plaintiff's proffered testimony of Dr. Rawlings as to the appropriate standard of care which Dr. McAuley owed to his patient, Charlean Troupe. It necessarily follows that, consistent with our case law, the trial judge likewise did not err in granting a directed verdict in favor of the defendants at the close of the plaintiff's case-in-chief.

¶31. Consistent with the directed verdict, the trial court subsequently entered a final judgment dismissing the plaintiff's claims against the defendants. For the reasons stated, the Lee County Circuit Court's final judgment in favor of Dr. James McAuley, North Mississippi Medical Center, Inc., North Mississippi Health Services, Inc. and North Mississippi Surgical Center, Inc., and against Charlean Troupe, is affirmed.

¶32. **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, P.J., AND GRAVES, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**