KING, C.J.,
 

 for the Court.
 

 ¶ 1. On December 31, 2002, Horace A. Ryals (Horace) filed a complaint alleging negligence on the part of Dr. Phillip Ber-tucci and Dr. John Finch. The matter proceeded to trial. On May 30, 2007, the trial court granted the defendants’ motion for a directed verdict. Aggrieved, Horace appeals, raising one issue: whether the trial court erred by directing a verdict in favor of the defendants and by ruling that Horace failed to establish medical negligence. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On May 28, 2002, Horace was attempting to use his pickup truck to drag a finger pier onto the riverbank. The rope snapped and hit the back windshield of Horace’s pickup truck, causing the back windshield to shatter. Glass sprayed into Horace’s face and eyes, causing multiple cuts and bleeding. Horace was transported to the emergency room at the Memorial Hospital in Gullport, Mississippi for treatment.
 

 ¶ 3. Dr. Finch examined Horace in the emergency room. Dr. Finch testified that Horace complained of being struck in the face with a rope. From his examination, Dr. Finch determined that Horace had multiple lacerations to the face, a frosted
 
 *1092
 
 area to his left pupil, fuzzy vision, and blood in his right eye — also known as a hyphema. Dr. Finch used an ophthalmo-scope and fluorescein dye to exam Horace’s eyes. He also inverted Horace’s eyelids to check for glass. Dr. Finch did not record the results of either test in Horace’s medical chart. However, he testified that there was a hyphema in Horace’s right eye, but he could still see the pupil in the eye. Dr. Finch checked Horace’s visual acuity, and Horace stated that he could only see red with a bright light in his right eye. Dr. Finch ordered an x-ray of Horace’s eyes. Dr. Finch testified that looking at the x-rays, he did not see any foreign bodies in Horace’s eyes.
 

 ¶ 4. Dr. Finch called Dr. Bertucci, an ophthalmologist, and consulted with him as to a recommendation for Horace’s care. Based on them conversation, Dr. Finch prescribed Horace three different eye drop medications and a pain reliever. He put a patch over Horace’s right eye and instructed Horace not to lie down during the night and to apply the eye drops as instructed. A follow-up examination was scheduled with Dr. Bertucci for the following morning. Horace was instructed to return to the emergency room if he experienced any problems during the night.
 

 ¶ 5. Dr. Bertucci testified that Dr. Finch called him on May 28, 2002, at approximately 6:30 p.m. Dr. Bertucci testified that Dr. Finch told him that he had a patient with facial lacerations around his eyes and a hyphema in his right eye. Dr. Bertucci testified that he asked Dr. Finch questions about the size of the hyphema, Horace’s vision in his right eye, and the pressure of the eye. Dr. Finch told Dr. Bertucci that he could still see Horace’s pupil in Horace’s right eye and that Horace’s vision was blurry. Based on this information, Dr. Bertucci assumed that Horace had a forty percent hyphema. Dr. Bertucci testified that Dr. Finch was not able to obtain Horace’s pressure in his right eye. Dr. Bertucci testified that Dr. Finch did not tell him that glass sprayed in Horace’s face. Dr. Finch also did not tell him the results of the fluorescein exam. However, Dr. Bertucci testified that he did not inquire about the results of the exam because he had enough information. Based, on Dr. Finch’s evaluation, Dr. Bertucci recommended that Dr. Finch shield Horace’s right eye and prescribe medication in the form of eye drops.
 

 ¶ 6. The following morning, Horace went to Dr. Bertucci’s clinic for his follow-up examination. Dr. Bertucci testified that uveal tissue was leaking out of Horace’s eye. Dr. Bertucci used a slit lamp to examine Horace and found a wound on Horace’s right eye. Dr. Bertucci then pulled Horace’s lower eyelid down and was able to trace the leak back to the wound found on Horace’s right eye. Dr. Bertucci recalled that Dr. Finch did not see a foreign body in Horace’s eye when Dr. Finch looked at the x-ray. Dr. Bertucci testified that he was under the impression, after them conversation the night before, that Dr. Finch was going to order a CAT scan of Horace’s eyes. However, no CAT scan was ordered. Based on his examination, Dr. Bertucci was concerned that there was a foreign body in Horace’s eye and ordered Horace to receive emergent evaluation and treatment from Dr. Laurence Ar-end at Ochsner Health System (Ochsner) New Orleans, Louisiana.
 

 ¶ 7. Horace went to Ochsner immediately to receive surgery on both of his eyes. Dr. Arend found a piece of glass in Horace’s right eye and found scarring on the cornea in Horace’s left eye. During the surgery, Horace suffered a retinal detachment in his right eye. Today, Horace is practically blind in his right eye.
 

 
 *1093
 
 ¶ 8. On December 31, 2002, Horace filed a lawsuit against Dr. Finch and Dr. Ber-tucci, alleging that the doctors’ negligent actions and omissions were the sole proximate cause or the proximate contributing cause of the loss of vision in his right eye. Specifically, Horace claimed that Dr. Finch failed to recognize the seriousness of his injuries and failed to accurately report the injury to Dr. Bertucci. He also claimed that Dr. Finch was negligent because he failed to order a CAT scan. Horace alleged that Dr. Bertucci was negligent in not coming to the emergency room to evaluate him on the evening of the incident.
 

 ¶ 9. The trial commenced in May 2007. Michelle Ryals (Michelle), Horace’s wife, testified that Dr. Bertucci called them after Horace’s surgery to check on his progress. Michelle testified that Dr. Bertucci said that “if we could have gotten him to Oehsner sooner, this might have been better.” Dr. Bertucci denied having that conversation with Michelle.
 

 ¶ 10. During the trial, Horace produced one expert witness — Dr. James Sutton, an ophthalmologist. Dr. Sutton testified that Dr. Finch breached the standard of care because he failed to record full and accurate results of his examination of Horace; he failed to conduct further examinations to rule out any foreign bodies in the eye; he failed to order a CAT scan; and he failed to supply Dr. Bertucci with information pertinent to Horace’s care. Dr. Sutton testified that Dr. Bertucci failed to ask Dr. Finch pertinent questions that would have allowed him to properly assess Horace’s condition. Dr. Sutton testified that Horace’s condition was misdiagnosed and that Horace received improper treatment. Based on Horace’s injury, Dr. Sutton testified that Horace’s eye should have been closed immediately with a rigid shield, and he should not have applied any pressure to his eye.
 

 ¶ 11. Several times during his testimony, Dr. Sutton was asked whether the failure of the doctors to timely diagnose Horace’s condition and the failure of the doctors to timely close Horace’s eye caused the loss of vision in Horace’s right eye. Ultimately, Dr. Sutton testified that the doctors’ misdiagnoses and Horace’s subsequent medical treatment probably caused additional damage to Horace’s eye. However, Dr. Sutton was not able to measure how much additional damage was caused. Dr. Sutton testified that he did not know what the result would have been if Horace had received proper medical treatment that night. Dr. Sutton testified that the injury should have been closed immediately to prevent infection and additional bleeding. However, there was no evidence that Horace’s eyes were infected.
 

 ¶ 12. When asked whether the retinal detachment was caused by the doctors’ delay in closing Horace’s eye, Dr. Sutton testified that the retinal detachment did not occur at the spot where the glass penetrated Horace’s eye. Instead, Dr. Sutton testified that the retinal detachment occurred at the spot where the surgeons at Ocshner inserted a tube into Horace’s eye. Dr. Sutton stated that retinal detachment was a complication of surgery, and it occurs when the surgeons cannot see the tip of the tube. Ultimately, Dr. Sutton testified that he could not say whether the glass, the blunt force trauma, the alleged improper care, or the tube used during the surgery caused the retinal detachment.
 

 ¶ 13. At the conclusion of Dr. Sutton’s testimony, the trial court addressed a defense motion for a mistrial based upon the concern that the parties could not conclude their cases before the upcoming Memorial Day holiday. The trial court suggested that the case continue through Saturday of that week. The trial court would observe
 
 *1094
 
 the holiday on Monday, and the case would reconvene on Tuesday. The parties, more specifically the defendants, opposed this suggestion, arguing that it would be prejudicial to their case. The trial court did not rule on the matter at that time. Ultimately, the parties did not have to continue the trial into the Memorial Day weekend.
 

 ¶ 14. On the same day, Dr. Bertucei and Dr. Finch moved for a directed verdict, arguing that Horace failed to establish proximate cause through Dr. Sutton’s testimony. The trial court found that Dr. Sutton’s testimony established that the doctors owed a duty to Horace, the standard of care, and how the doctors breached that standard of care. However, the trial court found that Dr. Sutton failed to establish with a reasonable degree of medical certainty that the doctors’ alleged acts of negligence caused or contributed to Horace’s loss of vision. Therefore, the trial court granted the doctors’ motion for a directed verdict.
 

 ¶ 15. Horace filed a motion for a new trial on June 4, 2007. On November 2, 2007, the trial court denied the motion. Aggrieved, Horace timely filed his notice of appeal.
 

 ANALYSIS
 

 ¶ 16. This Court reviews the trial court’s grant or denial of a motion for a directed verdict under a de novo standard of review.
 
 Pierce v. Cook,
 
 992 So.2d 612, 616 (¶ 8) (Miss.2008) (citing
 
 White v. Stewman,
 
 932 So.2d 27, 32 (¶ 10) (Miss.2006)). “In conducting such a review, we ‘must decide whether the facts presented, together with any reasonable inferences, considered in the light most favorable to the nonmoving party, point so overwhelmingly in favor of the movant that reasonable jurors could not have returned a verdict for the plaintiff.’ ”
 
 Troupe v. McAuley,
 
 955 So.2d 848, 858 (¶ 28) (Miss.2007) (quoting
 
 Robley v. Blue Cross/Blue Shield,
 
 935 So.2d 990, 996 (¶ 16) (Miss.2006)).
 

 A. Directed Verdict
 

 ¶ 17. Horace argues that Dr. Sutton’s testimony more than suggested that the doctors’ misdiagnoses, their failure to shield Horace’s eye, and the subsequent improper medical treatment was a major contributing factor to his vision loss. Thus, he contends that the trial court erred by directing a verdict in favor of Dr. Finch and Dr. Bertucei. Conversely, Dr. Finch and Dr. Bertucei argue that Dr. Sutton never testified that any breach of the standard of care proximately caused Horace’s loss of vision. Therefore, they contend that the trial court did not err by granting their motion for a directed verdict.
 

 ¶ 18. To establish a prima facie case of medical negligence, the plaintiff must produce evidence of the following:
 

 (1) The existence of a duty on the part of the defendant to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury;
 

 (2) A failure to conform to the standard required of the defendant; [and]
 

 (3) An injury to the plaintiff proximately caused by the breach of such duty by the defendant^]
 

 Drummond v. Buckley,
 
 627 So.2d 264, 268 (Miss.1993) (citing
 
 Burnham v. Tabb,
 
 508 So.2d 1072, 1074 (Miss.1987)). These factors must be established by expert testimony.
 
 See Troupe,
 
 955 So.2d at 856 (¶ 22).
 

 ¶ 19. The trial court found that Dr. Sutton’s testimony was sufficient to establish the duty the doctors owed to Horace, the applicable standard of care, and how each doctor breached that standard of care. However, the trial court found that
 
 *1095
 
 Horace did not provide adequate proof of proximate cause. Specifically, the trial court found that Dr. Sutton failed to express within a reasonable degree of medical certainty that the acts of negligence of Dr. Finch and Dr. Bertucci caused or contributed to Horace’s vision loss.
 

 1. Horace’s Left Eye
 

 ¶ 20. For the purposes of our analysis, we will discuss those portions of Dr. Sutton’s testimony that deal with the proximate cause element of medical negligence. During direct examination, Dr. Sutton was asked the following in regard to Horace’s left eye:
 

 Q. Now, did that failure to timely diagnose and timely close that full thickness corneal laceration on the left eye cause Mr. Ryals any permanent injury?
 

 A. He has a scar on that cornea from where the injury occurred.
 

 Q. Is that scar, in your opinion based on a reasonable degree of medical certainty, due to any delay?
 

 A. I’ve had scars like this that we’ve closed immediately. The quicker you take care of these sort of injuries, typically the better the result. A laceration like that is going to leave a scar on the cornea. If you leave it open, it will get infected, those kinds of things.
 

 Q. To your knowledge did it become infected?
 

 A. I don’t believe so.
 

 Q. To your knowledge does he have any significant vision loss as a result of that?
 

 A. I think the vision — the vision, if you’re just measuring his visual acuity in the left eye is reasonable. I don’t remember what the number is. I think it was 20/25 or pretty good vision. But at night when his pupil in his only good remaining eye when his pupils dilates [sic] up when he’s driving, headlights and oncoming lights hit that scar, and most patients that would give you a glare or symptoms of glare, and sometimes those can be debilitating.
 

 ¶ 21. Dr. Sutton testified that the doctors failed to close Horace’s eye immediately and that closing the eye prevents infection. However, there was no evidence that Horace’s left eye was infected. When asked if the delay in Horace’s care caused the scar on his left eye, Dr. Sutton essentially testified that the delay did not cause the scar. His testimony reflects that the scar was caused by the injury. Dr. Sutton also testified that Horace has “pretty good vision” in his left eye.
 

 2. Horace’s Right Eye
 

 ¶ 22. Dr. Sutton was also questioned regarding the damage sustained to Horace’s right eye. Dr. Sutton testified that Dr. Finch believed Horace had only a bruised right eye, which resulted in the recommended treatment. He testified that the treatment Horace received would have been reasonable treatment if Horace only had a bruised eye. During direct examination, Dr. Sutton was also asked the following:
 

 Q. If you would, there’s been a lot of testimony and controversy over whether or not prompt closure of the globe, shielding of the eye, no manipulation, no pressure on the eye conducted on the evening of the 28th in the emergency room would have made a substantial difference and more likely than not prevented the vision loss that [Horace] has in his right eye. Do you have an opinion based on a reasonable degree of medical probability whether or not [that] ... would have in fact made a substantial difference in his outcome.
 

 Dr. Sutton testified that the injury should have been closed immediately. He also
 
 *1096
 
 discussed how the medical notes did not show that Horace’s eye was deformed, and he discussed the misdiagnoses. Then, Dr. Sutton testified that:
 

 [A.] So the question is somewhat hypothetical. Had he had gotten it closed that night, that night in the hospital at Gulfport Memorial, they had taken him into the opei’ating room, closed the globe the next morning, called the retina specialist, whoever and said, I’ve got this guy, closed his open globe last night, the globe’s intact, I need you to evaluate him for the removal of this foreign body. That’s the way — I mean, what would the result of that have been? I mean, we don’t know.
 

 Dr. Sutton testified that an injury of that nature should be closed immediately to prevent infection and bleeding and to reestablish the normal integrity of the eye. However, Dr. Sutton testified that there was no evidence that Horace’s right eye was infected.
 

 ¶ 23. When asked whether the doctors’ delay in closing Horace’s eye complicated his surgery, Dr. Sutton testified that it does complicate the surgery. However, the surgery is not impossible. It just becomes more tedious. Then, Dr. Sutton was asked the following:
 

 Q. Do you have an opinion as to whether or not [the retinal detachment] was a result of the delay or partially caused by the delay?
 

 [[Image here]]
 

 A. It’s interesting that the retinal detachment which is accurately described in the operative note from Ochsner does not describe the retinal detachment being in the area of the injury. It’s not where the glass went it. It’s not where we closed the open globe. It’s around the inferior temporal edge ... where the infusion came in. Remember, we talked about when you take the jelly out of the eye, you have to run fluid in ... that infusion cannula, the little tube that brings the fresh saline into the eye that they weren’t able to see it. It’s interesting that the retinal detachment was down around that cannula according to the report and not around where the glass went in the eye.
 

 Q. That doesn’t mean they did anything wrong in the surgery, does it? A. No they did absolute everything that they could to save the eye.
 

 [[Image here]]
 

 It’s a known potential complication of doing retinal surgery that when you place that infusion cannula, if you can’t see the tip, and [the doctors] clearly state we could not see the tip, the end of the cannula, when you turn that fluid on, if that tip happens to be under the retina, the retina’s going to come off.
 

 ¶ 24. During the cross-examination, Dr. Sutton was asked the following:
 

 Q. Doctor [Sutton], you indicated that you don’t know what caused the retinal detachment of the patient in this particular case.
 

 A. That’s correct.
 

 [[Image here]]
 

 A. I don’t know absolutely the exact etiology. It could have been from the foreign body penetrating the eye. It could have been from the infusion cannula possibly. Could have been during the surgery. So to say exactly what caused it, I could not.
 

 ¶ 25. Then, defense counsel asked Dr. Sutton why Horace could not see out of his right eye. At one point during his testimony, Dr. Sutton said that the injury Horace received and the subsequent care that he received left him blind in his right eye. Dr. Sutton then testified that Horace could not see out of his right eye due to the scarring in the macula, which is the center
 
 *1097
 
 of the retina. He also testified that he could not say with a reasonable degree of medical probability that the scarring in the macula was caused by the blunt force trauma to Horace’s eye, the glass in the eye, the doctors’ alleged negligence, or Horace’s pre-existing eye condition.
 

 3. Proximate Cause
 

 ¶ 26. As previously mentioned, we selected portions of Dr. Sutton’s testimony to demonstrate how he answered questions regarding proximate cause. However, we have considered the entirety of Dr. Sutton’s testimony; essentially, he failed to establish proximate cause. Dr. Sutton testified regarding Horace’s retinal detachment. However, he did not affirmatively state that the retinal detachment was caused by any negligent acts of Dr. Finch or Dr. Bertucci. Dr. Sutton testified that Horace could not see out of his right eye due to scarring in the macula. However, Dr. Sutton failed to state affirmatively whether the macular scarring was caused by any negligent acts of Dr. Finch or Dr. Bertucci. When asked whether Horace’s outcome would have been different if the doctors had properly diagnosed Horace’s condition and promptly closed his eye, Dr. Sutton stated that he did not know.
 

 ¶ 27. In Horace’s appellate brief, he points out various passages of testimony from Dr. Sutton, which he believes are sufficient to establish proximate cause. However, many of the passages simply describe the duty the doctors owed to Horace, the applicable standard of care, and how each doctor allegedly breached that duty. As Dr. Sutton testified, perhaps the doctors should have ordered a CAT scan, closed the eye immediately, placed a rigid shield over the eye, instructed Horace not to apply pressure to his eye, and so on. However, Dr. Sutton’s testimony failed to show that the alleged negligent acts of Dr. Finch and Dr. Bertucci proximately caused the blindness in Horace’s right eye. Thus, we find that the trial court did not err by directing a verdict in favor of Dr. Finch and Dr. Bertucci. This issue is without merit.
 

 B. Michelle Ryals’s Testimony
 

 ¶ 28. As previously mentioned, Michelle testified that Dr. Bertucci expressed to her that Horace’s situation might have been better if they had gotten Horace to Ochs-ner sooner. Dr. Bertucci denied making the statement. Horace argues that this statement could be used to establish causation and whether or not the lack of treatment worsened his condition.
 

 ¶ 29. Generally, the alleged medical negligence of a physician must be established through expert testimony.
 
 Hubbard v. Wansley,
 
 954 So.2d 951, 957 (¶ 12) (Miss.2007) (quoting
 
 Barner v. Gorman,
 
 605 So.2d 805, 809 (Miss.1992)). However, “ ‘where a layman can observe and understand the negligence as a matter of common sense and practical experience,’ expert testimony is not necessary.”
 
 Id.
 
 at 960-61 (¶ 29) (quoting
 
 Palmer v. Anderson Infirmary Benevolent Ass’n,
 
 656 So.2d 790, 795 (Miss.1995)).
 

 ¶ 30. The issue in this case is whether the doctors’ misdiagnoses of Horace’s condition and the subsequent delayed treatment proximately caused the loss of vision in Horace’s right eye. The record before this Court does not contain any expert testimony, which connects the medical misdiagnoses and treatment delay to the cause of Horace’s blindness. The nature of Horace’s injury is such that it is beyond the common knowledge of laymen and, therefore, requires expert testimony. Notwithstanding the possible truthfulness of Michelle’s testimony regarding the statement that Dr. Bertucci allegedly made to her, such testimony is not admis
 
 *1098
 
 sible expert testimony. Therefore, we find that this argument is without merit.
 

 C. Motion for a Mistrial
 

 ¶ 31. In a cursory manner, Horace alleges that the trial court pressured the parties to conclude their case before the Memorial Day weekend, causing prejudice to their case.
 

 ¶ 32. Horace failed to provide this Court with any authority in support of this contention. “A party’s failure to cite authority in support of an argument precludes consideration of the issue on appeal.”
 
 Griffith v. Griffith,
 
 997 So.2d 218, 225 (¶ 26) (Miss.Ct.App.2008) (citing
 
 Boutwell v. Boutwell,
 
 829 So.2d 1216, 1223 (¶ 29) (Miss.2002)). Therefore, this issue is procedurally barred from our review.
 

 ¶ 33. Despite this procedural bar, we find no error because the parties did not have to continue the case through the Memorial Day weekend. This issue is moot.
 

 ¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ„ CONCUR. ROBERTS, J., NOT PARTICIPATING.