942 So.2d 301 (2006)
Ardean MITCHELL, as Administratrix of the Estate of Fate Mitchell, Deceased, for and on Behalf of all Heirs at Law of Fate Mitchell, Appellant,
v.
UNIVERSITY HOSPITALS AND CLINICS-HOLMES COUNTY, Appellees.
No. 2005-CA-01728-COA.
Court of Appeals of Mississippi.
November 14, 2006.
Gail S. Akin, attorney for appellant.
Corrie Schuler Lanny R. Pace, Jackson, attorneys for appellees.
Before LEE, P.J., IRVING and ISHEE, JJ.
LEE, P.J., for the Court.

PROCEDURAL HISTORY
¶ 1. On October 7, 2002, Fate Mitchell filed suit against University Hospitals and Clinics (Hospital) in the Holmes County Circuit Court alleging that the Hospital's negligence in his treatment proximately caused injury and damage to his person, resulting in mental pain and suffering, physical pain and suffering, and loss of enjoyment of life. Mitchell also asked for *302 punitive damages, alleging that the Hospital's actions amounted to wanton, willful and malicious conduct. Fate Mitchell passed away on April 13, 2003, after which his widow, Ardean Mitchell, was appointed administratrix of his estate and substituted as the party plaintiff.
¶ 2. Pursuant to the Mississippi Tort Claims Act, Mississippi Code Annotated Section 11-46-13(1) (Rev.2002), a bench trial was held. On August 11, 2005, the trial court entered an order dismissing the case, finding that Mitchell failed to prove that removing the supplemental oxygen was the proximate cause of Fate's respiratory arrest and that the Hospital exercised the proper standard of care in treating Fate. Aggrieved, Mitchell now appeals to this Court asserting the following issues, which we will cite verbatim:
(1) The fact finder improperly disregarded substantial evidence in finding that Appellee, by and through its employees, was not liable for medical negligence to the Appellant and was manifestly in error in this finding.
(2) The fact finder improperly disregarded competent and substantial evidence that the Appellee's breach of the standard of care, including removing Mr. Mitchell's oxygen prior to transferring him from the Emergency room to the third floor to be admitted, was the proximate cause of his arrest.
(3) The fact finder was manifestly in error in failing to find that the medical negligence of Appellee caused or contributed to Mr. Mitchell's injuries and damages and in failing to find that Mr. Mitchell sustained any damages.

FACTS
¶ 3. On the morning of July 2, 2001, an ambulance arrived at the Holmes County home of Fate Mitchell. Fate was short of breath, his face and legs were swollen and he had not urinated in over two days. Fate had been taking medication to reduce extra fluid in his body caused by congestive heart failure but had run out of the medication a few days earlier. Aside from congestive heart failure, Fate had numerous medical problems including severe diabetes and hypertension. In 1988, Fate was the victim of a shooting which resulted in paralysis from the waist down, a paralyzed diaphragm, and the removal of a portion of his right lung. Fate was prescribed supplemental home oxygen in 1996 for chronic respiratory problems. According to home health records, Fate was on the supplemental oxygen for sixteen to eighteen hours per day. Fate also had a history of depression and anxiety.
¶ 4. Upon arrival at the Mitchell's home, the emergency medical technicians (EMTs) placed Fate on fifteen liters per minute of oxygen and administered aspirin, a morphine IV, nitroglycerine and Lasix to reduce his fluid levels. The EMTs noted that Fate was not using his supplemental home oxygen when they arrived. Fate's oxygen saturation level was determined to be at eighty-five percent without supplemental oxygen. While en route to the hospital Fate's condition improved, such that he was able to inform the EMTs he was breathing better. Fate's oxygen saturation level was checked again in the emergency room and was ninety-seven percent.
¶ 5. After arriving at the emergency room, Fate was given more Lasix to remove fluid and was administered a chest x-ray as well as an EKG by Dr. Christopher Jackson. Fate's supplemental oxygen was reduced from fifteen liters per minute to two liters, his usual intake. Dr. Jackson noted that Fate had not had a heart attack but did have severe congestive heart failure. After spending over two hours in the emergency room, Fate was admitted for *303 further treatment to reduce his fluid levels. Fate was taken off oxygen for transport to a hospital room on the third floor. Upon reaching the third floor, Fate stopped breathing and went into respiratory arrest. A "code" was called and medical personnel began to revive Fate, who was intubated. After Fate was stabilized, he was transported to University Medical Center in Jackson. Fate spent approximately one week in Jackson before being discharged.

STANDARD OF REVIEW
¶ 6. It is well settled that "in a bench trial the trial judge sits as the trier of fact and is accorded the same deference in regard to his findings as that of a chancellor, and the reviewing court must consider the entire record and is obligated to affirm where there is substantial evidence in the record to support the trial court's findings." Barnett v. Lauderdale County Bd. of Supervisors, 880 So.2d 1085, 1088(¶ 7) (Miss.Ct.App.2004). The trial court's findings will not be disturbed unless the court abused its discretion, was manifestly wrong, or applied an erroneous legal standard. City of Newton v. Lofton, 840 So.2d 833, 835-36 (¶¶ 6-7) (Miss.Ct.App.2003).

DISCUSSION
I. DID THE TRIAL COURT ERR IN FINDING THAT FATE DID NOT RECEIVE NEGLIGENT MEDICAL TREATMENT?
¶ 7. As Mitchell's three issues discuss the trial court's error in finding that the hospital was not liable for Fate's injuries, we will frame them as one issue. Mitchell's main argument is that there was substantial evidence for the trial court to find the hospital was medically negligent in removing Fate's supplemental oxygen while he was transported from the emergency room to a room on the third floor, thus causing Fate's respiratory arrest and resulting injury.
¶ 8. A plaintiff seeking to recover for negligent treatment and/or performance must show by a preponderance of the evidence that the defendant had a legal duty, that he breached that duty when he failed to conform to the required standard of care, that this breach was the proximate cause of the injury, and that damages were suffered. Hill v. Warden, 796 So.2d 276, 280(¶ 10) (Miss.Ct.App.2001). The plaintiff must also show, by expert testimony, that the physician deviated from the appropriate standard of care and that deviation was the proximate cause of the injury of which the plaintiff complains. Palmer v. Biloxi Reg'l Med. Ctr., Inc., 564 So.2d 1346, 1355 (Miss.1990).
¶ 9. "Mississippi physicians are bound by nationally-recognized standards of care; they have a duty to employ `reasonable and ordinary care' in their treatment of patients." Id. at 1354. Our supreme court set out the standard of care for cases of medical malpractice in Hall v. Hilbun, 466 So.2d 856, 873 (Miss.1985), when it said:
[G]iven the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.
¶ 10. Mitchell's designated expert, Dr. David Goldstein, testified that the care rendered to Fate fell below the standard of care because the hospital failed to continuously *304 monitor Fate's oxygen saturation level; an arterial blood gas procedure was not performed on Fate; the staff failed to administer a nebulizer treatment to treat Fate's lungs; and the staff failed to keep Fate on supplemental oxygen during transport.
¶ 11. In response, Dr. Steven Stogner, the expert for the Hospital, testified that the staff acted appropriately and met the standard of care in their treatment of Fate. Dr. Stogner stated that it was reasonable for Dr. Jackson to not order an arterial blood gas procedure on Fate for the simple reason that Fate's condition had greatly improved by the time he arrived at the emergency room. Fate's oxygen saturation level was initially recorded upon his arrival at the hospital and, although his oxygen saturation level was not recorded by the staff after the initial reading, there was testimony that this level was closely monitored. Dr. Stogner also stated that the use of a continuous pulse oximeter, a device which monitors oxygen levels in the blood, obviated the need to make constant notations of Fate's oxygen saturation levels. The testimony showed that had any decrease in Fate's oxygen saturation level occurred, then appropriate steps would have been taken to correct it. Dr. Jackson testified that once the staff realized that Fate's oxygen saturation level was within the normal range, the oxygen mask was replaced with a nasal cannula, much like Fate used at home while on supplemental oxygen. There was also testimony that Fate's chronic respiratory condition enabled his body to adapt to operate on lower oxygen levels.
¶ 12. In regards to the nebulizer treatment, Dr. Stogner testified that a nebulizer treatment would be administered to a patient in respiratory distress. Dr. Stogner stated that Fate's condition had improved significantly and a nebulizer treatment was unnecessary. Mitchell also failed to show that this decision by the staff fell below the standard of care or contributed to Fate's respiratory arrest.
¶ 13. Dr. Goldstein and Dr. Jackson did agree that Fate's supplemental oxygen should not have been removed. However, neither Mitchell nor Dr. Goldstein could show a causal connection between Fate's injuries and the Hospital's conduct. Furthermore, Dr. Stogner and Dr. Jackson stated that the lack of supplemental oxygen for that brief period during transport could not have caused Fate's respiratory arrest. In fact, there was testimony that respiratory failure was a progressive part of Fate's condition, namely the congestive heart failure. Dr. Stogner testified that the use of supplemental oxygen was to treat Fate's chronic respiratory problems and not to prevent an acute respiratory problem.
¶ 14. Mitchell argues that the testimony of nurse Allison Schuler was not credible because she did not continuously document Fate's oxygen saturation level. However, the trial court found that the failure to document these levels did not equate with a failure to monitor these levels.
¶ 15. There was also testimony from members of Fate's family that they heard him ask the nurse for oxygen while being transported from the emergency room to the third floor. However, two nurses testified that they were able to converse with Fate during transport and at no time did he ask for supplemental oxygen.
¶ 16. There was testimony from Fate's wife and children that his activities were drastically curtailed after his respiratory arrest. However, there was also testimony that some of the problems, namely memory loss, that Fate experienced had occurred prior to July 2, 2001. Upon returning from the hospital, Fate remained *305 on the same amount of supplemental oxygen and the same medications.
¶ 17. The trial court concluded that Mitchell did not prove the brief removal of supplemental oxygen was the proximate cause of Fate's respiratory arrest. There is substantial evidence in the record to support the trial court's ruling; thus, we affirm.
¶ 18. THE JUDGMENT OF THE HOLMES COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.