CARLTON, J.,
for the Court:
¶ 1. James and Eva Taylor filed this Mississippi Torts Claim Act (MTCA) medical-malpractice suit pursuant to Mississippi Code Annotated section 11-46-13(1) (Rev.2002) against Delta Regional Medical Center (DRMC), alleging negligence by DRMC’s physicians and staff after James suffered a stroke.
¶ 2. Specifically, the Taylors claimed that DRMC physicians and staff negligently breached the applicable standard of medical care in rendering treatment to James upon his presentation to DRMC’s emergency room (ER) for stroke symptoms. The Taylors claim this negligent medical care proximately caused James to subsequently suffer damages and permanent debilitating conditions resulting from a massive stroke suffered after his discharge from DRMC. The Taylors asserted in their complaint that if James had been properly diagnosed and treated, then he would not have suffered his current debilitation and partial paralysis in his right hand, right arm, right leg, and right foot.
¶ 3. The judgment and opinion and order of the circuit judge after a bench trial[1] shows that the circuit judge found that DRMC ER physician Dr. Hilton O’Neal “breached the applicable standard of care incumbent upon him by failing to admit [James] to the hospital, to provide him with supportive care treatment!,] and to monitor him for a progressive worsening of his symptoms, and in failing to do so, Dr. O’Neal was negligent.” The circuit judge additionally held that James suffered the following injuries and damages as a proximate result of Dr. O’Neal’s negligence: permanent impairment and partial loss of use of full body function; permanent loss of wage-earning capacity; past, present, and future medical expenses and costs of rehabilitation; past, present, and future pain and suffering, mental and emotional distress, and loss of enjoyment of life; and past, present, and future out-of-pocket expenses related to his medical care and hiring of outside individuals to perform activities and household chores that he could no longer perform himself due to his injuries. With respect to the Taylors’ claim for loss of consortium, the circuit judge found that Eva had been deprived of services, society, companionship, and marital rights and had experienced pain, suffering, anxiety, and emotional upset as the proximate result of Dr. O’Neal’s negligent care in providing medical treatment. The circuit judge awarded the Taylors $390,000 in monetary damages. In its final judgment, the circuit court adopted and incorporated the findings set forth in the court’s previously issued opinion and order.
¶ 4. On appeal, DRMC asserts the following assignments of error:
(1) the [circuit] court erred as a matter of law and abused its discretion because it did not make specific findings of fact and conclusions of law that can be reviewed[; and]
(2) the [circuit] court erred as a matter of law when it entered its final judgment on February 14, 2011[,] and its opinion and order on March 17, 2011, as the judgment and order taken together do not state findings of fact that establish a *15 standard of care, the legal standard that was breached, and causation between the breach and damages. There is no medical or scientific basis to support the final judgment and order and opinion entered by the [circuit] court.
¶ 5. We find no abuse of discretion by the circuit court, since the record reflects substantial evidence supporting its judgment.
FACTS
¶ 6. James worked as a forklift operator and material handler. His work week began on Monday and ended on Saturday. On Saturday, August 19, 2006, James worked until the end of his 3:30 p.m. shift and, feeling ill, went home to bed. He felt weak and dizzy on Sunday morning when awakened, so Eva called her son to drive James to the ER.
¶ 7. According to medical records from DRMC and Bolivar Medical Center (BMC) and testimony in the record, James[2] arrived at DRMC’s ER at 11:15 a.m. on the morning of Sunday, August 20, 2006, complaining of dizziness, lightheadedness, and right-sided weakness. The ER physician, Dr. O’Neal, took James’s medical history, as well as performed a physical examination, EKG, and a CT scan without contrast. After performing the tests, Dr. O’Neal rendered a differential diagnoses of James’s condition, stating the following three alternative diagnoses potentially causing James’s symptoms: “vertigo, TIA versus early CVA.” Dr. O’Neal prescribed Antivert and Plavix. The ER of DRMC discharged James at 1:45 p.m. on August 20, 2006, less than two hours after he arrived at the hospital. He was discharged with instructions to follow up with his primary physician in two to three days. Eva drove James to a local pharmacy to fill his prescriptions. James then took his medicine and returned home to Shaw, Mississippi.
¶ 8. The record shows that once James arrived home from the hospital, he suffered a progression of his symptoms over the course of several hours. James’s symptoms increased to include slurred speech and inability to walk independently. Eva then drove him to BMC, a different hospital in the region. James lacked the ability to walk on his own into BMC. The physicians at BMC conducted a full carotid work-up and diagnosed CVA,[3] or stroke, and BMC admitted James at approximately 6:30 p.m. for supportive care, treatment, and therapy. BMC provided James supportive medical care, such as oxygen and aspirin. The physicians at BMC diagnosed James as suffering from a stroke that caused damages including permanent impairment and partial loss of use of full body function. At BMC, James received medical treatment, supportive care, as well as speech, physical, and occupational therapy. BMC released James on August 24, 2006, but James continued to receive rehabilitative therapy on an outpatient basis and continued to suffer permanent debilitating conditions. The parties stipulated that James has been unable to return to work.
¶ 9. The Taylors subsequently filed suit against DRMC. The Taylors filed an amended complaint[4] on October 8, 2009, *16 alleging two theories of negligence.[5] First, they alleged James should have been given tPA, or another form of throm-bolytic agent, on presentation to the DRMC emergency department. Second, they alleged the failure to admit James to DRMC and provide supportive care, which breached of the standard of care, proximately caused James’s injuries. Pursuant to Mississippi Code Annotated section 11-46-13(1), a'bench trial was held on June 7-9, 2010.
¶ 10. At trial, the Taylors presented the following two medical experts[6] in support of their theory: Dr. David Wiggins, an expert in the field of emergency medicine, and Dr. Frances Mary Dyro, an expert in the field of neurology.[7] The complaint reflects the Taylors asserted two theories of medical negligence. The first basis asserted negligence in the failure to administer thrombolytic agent (tPA). The second basis asserted negligence in the failure of DRMC to admit James for treatment and in the failure to provide supportive stroke care. At trial, the record shows both of the Taylors’ expert witnesses testified regarding both bases of asserted negligence. More specifically, both expert witnesses testified at trial that Dr. O’Neal[8] breached the standard of care because he failed to administer tPA to James to reverse the effects of a stroke in progress. The Tay-lors’ experts testified that James should have been admitted to DRMC for treatment and for supportive care when diagnosed with the differential diagnoses, which included possible early CVA, to prevent his condition from worsening and to treat the trauma of the stroke.
¶ 11. Dr. Wiggins’s testimony particularly addressed the failure of Dr. O’Neal and DRMC to provide supportive care or further monitoring and treatment. Dr. Wiggins’s testimony also addressed Dr. O’Neal’s differential diagnoses of “vertigo, TIA versus early CVA.” Dr. Wiggins opined that Dr. O’Neal negligently failed to complete his diagnoses of the source of James’s impairments before discharging James. In support of his opinion regarding negligence, Dr. Wiggins cited to James’s medical records from DRMC’s ER on the date at issue, wherein the clinical impression by Dr. O’Neal provides a differential diagnoses, and the discharge instructions recommend “follow up with [primary care physician] on Monday if no improvement.”
¶ 12. Dr. Wiggins testified at trial as follows regarding Dr. O’Neal’s differential medical diagnoses and the standard of care requiring supportive stroke care:
A: Well, it’s my professional opinion that the standard of care is to admit patients for ischemic strokes to provide them supportive care and to mon *17 itor for the progression of symptoms, and in failing to do that, [Dr. O’Neal] was negligent.
Q: Specifically, what in the medical record would signal to you that Dr. O’Neal should have admitted [James]?
A: Well, his diagnoses itself is the main thing. He considered TIA vs. early CVA. Both TIA and CVAs are admitted. The standard of care is to admit these patients for supportive care and further monitoring, progression of the stroke further, and perhaps reverse any subsequent deficits that may arise.
Q: What type of supportive care?
A: Generally, when we admit people through the emergency department, we’ll start them on oxygen, which is very important. We’ll make sure they receive an aspirin, which is also very important, although it doesn’t seem like much.
Plavix is often used as well. We often start heparin, unless there is some contraindication to that, which in this case there wasn’t, and we would consider the use of tPA. We would give IV fluids, I should add that in there too, as indicated.
Q: Other than the Plavix, were any of these forms of supportive care given to [James] by Dr. O’Neal?
A: No.
Q: What benefits might you expect from such supportive care?
A: Well, I would say it’s my opinion that had supportive care been given[,] there would have been no progression of the symptoms.
¶ 13. Dr. Wiggins acknowledged that James’s reported symptoms reflected that James presented to DRMC outside the recommended window of time for administering tPA in accordance with the medical standard of care. Dr. Wiggins explained, however, that supportive care assists in managing the neurological events and trauma of a stroke while it occurs, thereby reducing the damages resulting from the stroke. He testified that supportive care included monitoring for more effective management of worsening conditions, as well as further testing, treatment, observation, and diagnoses. Dr. Wiggins explained that the infusion of heparin was an example of supportive care, and that heparin proved effective in preventing the worsening of damage from strokes.
¶ 14. Dr. Wiggins explained the distinction between the use of tPA and treatment with supportive care and monitoring, and the use of administering medication such as heparin. He testified that tPA actually reverses a stroke, whereas heparin prevents a worsening of the stroke. With respect to the standard of care, Dr. Wiggins testified to the widespread practice of his profession of emergency medicine and to the widespread literature establishing that the standard of care herein required hospital admission, as well as supportive stroke care and treatment to prevent progression or injuries resulting from a stroke. Without specifying any particular article, journal, or treatise other than Tin-tinalli’s textbook on emergency medicine, Dr. Wiggins explained on cross-examination as follows:
A: As a matter of fact, I would say this: None of the literature that was presented to me or Tintinalli[’s textbook], which is included in that, would contradict the knowledge that aspirin, oxygen, [and] IV fluids are effective in the acute treatment of a CVA.
The literature — it’s common medical knowledge in emergency medicine. That’s the standard of care to use those, and I don’t think there is any literature that exists that would say *18 that those are not effective care of an acute CVA.
In response to the issue of whether I — my responses earlier were an indication that I don’t currently have any literature in my hand, and they really weren’t intended to go any further than that. I thought the question being proposed to me was did I bring some articles with me today that would show this or that, and the answer to that is no, I haven’t. But I didn’t intend for my answer to be extrapolated any further than that when I gave it.
Q: Based on — what is your understanding as to why such supportive care is given?
A. The reason supportive care is given is it’s an attempt — and I think we need to draw a distinction here, too. There’s the prevention of the progression of the stroke, and there’s the reversal of some of the symptoms of a stroke. In this case, I think that an adequate outcome would have been the prevention of progression of symptoms. That’s my professional opinion, I should say.
As quoted above and as reflected in further testimony, Dr. Wiggins referenced Tintinalli’s medical textbook and relied on his residency training and ER experience as an emergency medicine physician in opining that the generally accepted standard of medical care applicable in this case required hospital admission, further diagnostic and medical treatment, and supportive stroke care. On cross-examination, Dr. Wiggins also agreed with DRMC that the study proffered by DRMC, the American Stroke Association’s (ASA) Guidelines for the Early Management of Patients with Ischemic Stroke: A Scientific Statement from the Stroke Council of the American Stroke Association,[9] is an authority for establishing the standard of care in stroke patients and contains guidelines reflecting when to administer tPA. Dr. Wiggins testified that no conflict existed between his testimony and that source.
¶ 15. Dr. Dyro testified, as previously acknowledged, that DRMC breached the applicable standard of care through Dr. O’Neal’s failure to admit James to the hospital and through his failure to administer supportive stroke care. Dr. Dyro further opined that Dr. O’Neal negligently failed to either consult a neurologist or conduct a neurological examination himself. Dr. Dyro also testified that Dr. O’Neal negligently failed to administer tPA to James, since his symptoms were in the early stages at DRMC, notwithstanding the time frame of the onset of his symptoms. DRMC cross-examined both Dr. Wiggins and Dr. Dyro with the literature from the ASA, which reflected the standard of care required administering tPA within three hours of the onset of the symptoms. Dr. Dyro acknowledged in her trial testimony that monitoring a stroke patient can change the outcome because monitoring enables the physician to formulate a treatment plan as symptoms or conditions occur. Without specificity, Dr. Dyro also testified that extensive studies showed a standard of care requiring that a patient with a stroke or potential stroke be admitted to either a designated stroke unit or even a hospital bed for monitoring and care.
¶ 16. DRMC also presented two experts, Dr. Angela Chandler, an expert in neurology, and Dr. Frederick Carlton, an expert in emergency medicine. Dr. Chan *19 dler testified that the only known cure for stopping an acute ischemic stroke is administering tPA, which, based on the nationally accepted guidelines, can only be given within a three-hour onset of the symptoms. Dr. Carlton testified the patient history reflected that when James arrived at DRMC, he fell outside of the three-hour window to properly administer tPA in line with the appropriate standard of care. Additionally, Dr. Chandler’s expert testimony contradicted the Taylors’ experts as to the effectiveness of supportive care and breach of the standard of care.
¶ 17. James’s primary care physician, Dr. James Warrington, testified by deposition that James’s condition showed no significant improvement, and that James currently suffers from partial paralysis and weakness in his entire right side, right arm, right hand, right leg, and right foot.
¶ 18. After hearing testimony from the experts and other witnesses,[10] the circuit judge requested proposed findings of facts and conclusions of law from both parties. The circuit court entered an opinion, order, and final judgment finding that Dr. O’Neal “breached the applicable standard of care incumbent upon him by failing to admit [James] to the hospital, to provide him with supportive care treatment[,] and [to] monitor him for a progressive worsening of his symptoms[.] [I]n failing to do so, Dr. O’Neal was negligent.”
¶ 19. The circuit judge held that James suffered the following injuries and damages as a proximate result of Dr. O’Neal’s negligence: permanent impairment and partial loss of use of full body function; permanent loss of wage-earning capacity; past, present, and future medical expenses and costs of rehabilitation; past, present, and future pain and suffering, mental and emotional distress, and loss of enjoyment of life, as a result of his physical injuries; and past, present, and future out-of-pocket expenses related to his medical care and hiring of outside individuals to perform activities and household chores that he can no longer perform himself due to his injuries. Regarding the loss-of-consortium damages, the circuit judge further found that Eva had been deprived of services, society, companionship, and marital rights and had experienced pain, suffering, anxiety, and emotional upset as the proximate result of the negligent care rendered to her husband by Dr. O’Neal in providing medical treatment. The circuit judge awarded the Taylors $890,000 in monetary damages. The record reflects that after the circuit court issued its opinion, order, and judgment, neither party requested, by post-trial motion or otherwise, the circuit court to find facts specially or to state separately its conclusions of law pursuant to Mississippi Rule of Procedure 52(a).
¶ 20. DRMC now appeals.
STANDARD OF REVIEW
¶ 21. The standard of review for factual determinations made by the trial judge as the sole trier of fact in a bench trial is “the substantial evidence standard.” Covington Cnty. v. G.W., 767 So.2d 187, 189 (¶ 4) (Miss.2000). The findings of the trial judge will not be disturbed unless the judge abused his discretion, was manifestly wrong or clearly erroneous or applied an erroneous legal standard. Id.; City of Jackson v. Perry, 764 So.2d 873, 376 (¶ 9) *20 (Miss.2000). “A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence.” Mason v. State, 799 So.2d 884, 885 (¶ 4) (Miss.Ct.App.2001) (internal quotations omitted). However, the Court reviews conclusions of law, including the proper application of the MTCA, de novo. City of Jackson v. Presley, 40 So.3d 520, 522 (¶ 9) (Miss.2010).
¶22. “When reviewing a trial court’s decision to allow or disallow evidence, including expert testimony, we apply an abuse of discretion standard.” Canadian Nat’l/Ill. Cent. RR. v. Hall, 953 So.2d 1084, 1094 (¶ 29) (Miss.2007). Unless this Court concludes that a trial court’s decision to admit or exclude evidence was arbitrary and clearly erroneous, that decision will stand. Irby v. Travis, 935 So.2d 884, 912 (¶ 79) (Miss.2006). See M.R.E. 103, 104 (no error predicated upon the admission of evidence unless a substantial right of a party is affected thereby); M.R.E. 702 (recognizes gatekeeping role of trial judge to determine whether the expert testimony is relevant to assisting the trier of fact and reliable).
¶ 23. With respect to the qualifications of an expert witness and the admission of expert testimony, the Mississippi Supreme Court in Mississippi Transportation Commission v. McLemore, 863 So.2d 31, 36-37 (¶ 13) (Miss.2003), identified factors for the trial court to utilize in determining the relevance and reliability of expert testimony. See also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The test of whether an expert qualifies to testify as such lies within the sound discretion of the trial court, and the determination depends on whether a witness possesses peculiar knowledge or information not likely to be possessed by a layman regarding the relevant subject matter. Partin v. N. Miss. Med. Ctr., Inc., 929 So.2d 924, 930 (¶21) (Miss.Ct.App.2005). The Partin Court relied on the plain language of Mississippi Rule of Evidence 702 and precedent in finding that “[w]hether any doctor may testify to a particular matter depends upon his knowledge, training, experience, and the like.” Id. at (¶ 20).
¶ 24. Regardless of “whether testimony is based on professional studies or personal experience, the ‘gatekeeper’ must be certain that the expert exercises the same level of ‘intellectual rigor that characterizes the practice of an expert in the relevant field.’” Giannaris v. Giannaris, 960 So.2d 462, 470 (¶ 16) (Miss.2007) (citations omitted). While relevance and qualifications to testify as an expert witness pertain to the admission of the evidence, any lack of foundation or explanation goes to the weight of the evidence, and not its admissibility. Harris v. Shields, 568 So.2d 269, 276 (Miss.1990) (citing M.R.E. 104(b)).
DISCUSSION
I. Whether the circuit court erred in failing to provide specific findings of fact and conclusions of law that can be reviewed.
¶ 25. On appeal, DRMC argues that the circuit court erred by failing to make specific findings of fact or include case law in its opinion and final judgment. DRMC concedes that the circuit court requested proposed findings of fact and conclusions of law from both parties, which both parties submitted. However, DRMC argues that the circuit court’s opinion and order failed to include any findings of fact, or expert testimony or any evidence relied upon, except a brief summary of the medi *21 cal records. DRMC submits that pursuant to Rule 52(a), the circuit court’s failure to include findings of fact or ease law in its judgment constitutes an abuse of discretion. DRMC argues that the circuit court’s judgment should therefore be reversed.
¶ 26. Turning to precedent, in McGuffie v. Duckworth, 208 So.2d 179, 181 (Miss.1968),[11] the Mississippi Supreme Court stated that where the trial judge sits as the trier of fact, no error will be found for the failure to make a finding that the court was not requested to make. Rule 52(a) provides guidance for parties requesting the court to find facts specially and to state separately its conclusions of law. The rule provides as follows:
In all actions tried upon the facts without a jury[,] the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon[,] and judgment shall be entered accordingly.
M.R.C.P. 52(a).
¶27. The Mississippi Supreme Court addressed Rule 52(a) in Tricon Metals & Services, Inc. v. Topp, 516 So.2d 236, 239 (Miss.1987), where the Mississippi Supreme Court stated:
Rule 52(a) vests in the trial court discretion whether findings of fact and conclusions of law should be made, absent, that is, a request of a party. That discretion, however, should be exercised soundly consistent with established principles regarding the sound and efficient administration of justice.... As a practical matter, [appellate courts] can better perform our function if we know what the trial court did, and why.
For these reasons, in cases of any significant complexity the word “may” in Rule 52(a) should be construed to read “generally should.” In other words, in cases of any complexity, tried upon the facts without a jury, the [c]ourt generally should find the facts specially and state its conclusions of law thereon.
As in other areas, we will not interfere with a trial court’s exercise of its discretion unless that discretion be abused. Where, however, a case is hotly contested and the facts greatly in dispute and where there is any complexity involved therein, failure to make findings of ultimate fact and conclusions of law "will generally be regarded as an abuse of discretion.
In Tricon Metals, the trial court provided no findings of fact or conclusions of law, and the supreme court explained that the omission of such precluded the court from conducting its normal appellate-review responsibilities because of the complexity of the issues. Id. at 238. The Tricon Metals court acknowledged that, ordinarily, the appellate court will not reverse findings of fact by the trial court sitting without a jury where those findings are supported by the evidence. Id.
¶28. The case before us differs from the dilemma presented in Tricon Metals, since the circuit court here indeed provided findings of fact and conclusions of law. We therefore turn to the facts and judgment in this case to determine the sufficiency of the findings of facts and conclusions of law provided, while adhering to our limited standard of review applicable to bench trials. DRMC asserts that the circuit court failed to provide specific findings of fact and conclusion of law sufficient for review, and we must ascertain whether the circuit court provided sufficient findings. In this task, we again acknowledge that the record shows that neither party *22 requested the circuit court to find facts specially or to state separately its conclusions of law. See Carpenter, 58 So.3d at 1161 (¶¶ 13-14); Amaraneni, 722 So.2d at 535 (¶ 19). Additionally, the record shows that the circuit provided an opinion and order consisting of two pages, and a final judgment consisting of two pages.
¶29. We find instructive the supreme court’s opinion in Pilgrim Rest Missionary Baptist Church v. Wallace, 835 So.2d 67, 74-75 (¶ 18) (Miss.2003). In Pilgrim Rest, the Mississippi Supreme Court refused to find error in the chancellor’s five page judgment that cited no legal authority where the judgment adequately stated findings of fact and aptly explained what the chancellor did. Id. Therefore, we must examine whether the circuit court’s findings and conclusions aptly explained the court’s decision and assessment of the evidence, thereby providing an adequate record for appellate review in this case.
¶ 30. A review of the record shows that the circuit court provided the following: a general statement of the facts; the court’s factual findings; and a general statement of the conclusions of the law applicable to this case. The court provided no citation to legal authority other than the MTCA. The circuit court’s findings and conclusions generally addressed its determination of the applicable standard of medical care, as well as addressing breach of the standard of care, proximate cause, damages, jurisdiction, venue, and liability under the MTCA in accordance with Mississippi Code Annotated section 11-46-7(2) (Rev. 2002). The circuit court found a negligent breach of the standard of medical care by Dr. O’Neal while in the course and scope of his employment at DRMC; and the circuit court found liability under section 11-46-7(2).
¶ 31. The record shows that the circuit judge’s opinion and order included the following:
Dr. [O’Neal], while acting in the course and scope of his employment, breached the applicable standard of care incumbent upon him by failing to admit [James] to the hospital, to provide him with supportive care treatment!,] and [to] monitor him for a progressive worsening of his symptoms, and in failing to do so, Dr. O’Neal was negligent.
The negligence of [DRMC] by and through Dr. O’Neal, as testified to and established by the [Taylors’] experts and facts herein, was the proximate cause of the damages suffered by [the Taylors],
The record also shows that the circuit court’s January 26, 2011 judgment incorporated the findings of facts and conclusions of law set forth in its opinion.
¶ 32. In Pilgrim Rest, 835 So.2d at 74 (¶ 18), the supreme court recognized that the main purpose of Rule 52(a) was to provide the appellate court with a sufficient record to review, and to guarantee that the trial court carefully reviews the evidence provided at trial. In Myers v. Myers, 741 So.2d 274, 277-78 (¶ 11) (Miss.Ct.App.1998), this Court recognized that a general statement of facts and law underlying a decision sufficiently satisfies the rule requiring trial courts to find facts specially and state separately its conclusions of law, even in the absence of precise recitations of or citations to the applicable law. The Myers Court confirmed that in accordance with the limited standard of review of bench trials, appellate courts will not reverse a judgment when the trial court’s findings are supported by substantial evidence. Id. at 278 (¶ 13) (citing Century 21 Deep S. Props. v. Corson, 612 So.2d 359, 367 (Miss.1992)).
¶ 33. Additionally, in TXG Intrastate Pipeline Co. v. Grossnickle, 716 So.2d 991, 1025 (¶ 130) (Miss.1997), the Mississippi Supreme Court explained that when reviewing non-jury cases, an appellate court *23 will assume the trial court made a determination of facts sufficient to support its judgment. The TXG court further explained that the trial court has discretion in finding facts specially, without interference from reviewing courts unless that discretion was abused. Id. at (¶ 128). The circuit court in the case before us provided a general statement of the relevant facts and general statements of the law underlying its decision. Precedent accepts such a general statement of facts and applicable law as sufficient; accordingly, we find no abuse of discretion in the circuit court’s findings of fact and conclusions of applicable law. See Myers, 741 So.2d at 277-78 (¶ 11). We find that the final judgment and incorporated opinion and order provide us with an adequate record to review and establish that the circuit court reviewed the evidence. See Pilgrim Rest, 835 So.2d at 74-75 (¶ 18); MacDonald v. MacDonald, 698 So.2d 1079, 1084 (¶ 25) (Miss.1997) (finding trial court’s findings of facts and conclusions of law provided adequate basis for appellate review).
II. Whether the circuit court erred as a matter of law when it entered its final judgment, order, and opinion, as the judgment and order taken together do not state findings of fact that establish a standard of care, the legal standard that was breached, and causation between the breach and damages. There is no medical or scientific basis to support the final judgment, order, and opinion entered by the circuit court.
¶ 34. Next, we must determine if substantial evidence in the record supports the judgment of the circuit court. In reviewing the circuit judge’s application of the law to this case, we must conduct a de novo review. Presley, 40 So.3d at 522 (¶ 9). We must also consider the related issue of whether substantial credible evidence in the record supports the circuit court’s opinion, order, and judgment, and in so doing, we must consider whether the record reflects the requisite proof by expert testimony as to the elements of this MTCA medical-malpractice action.[12]
¶ 35. DRMC’s second assignment of error, which has two subparts, first asserts that the circuit court erred as a matter of law by rendering a judgment and opinion that failed to state findings of fact that establish a standard of care, the legal standard breached, or causation between the breach and damages. DRMC also claims there is no medical or scientific basis to support the final judgment and opinion.[13] When reviewing the factual findings of the circuit court sitting as the sole trier of fact in a bench trial, we apply the substantial-evidence standard of review. Covington Cnty., 767 So.2d at 189 (¶ 4). In addressing DRMC’s assignments of error, we must determine whether the circuit court’s decision was supported by a sufficient medical or scientific basis.
¶ 36. The circuit court found that the applicable standard of medical care required James’s admission to the hospital (DRMC); required DRMC and Dr. O’Neal to provide James with supportive stroke care and treatment; and required monitoring for a progressive worsening of his symptoms. With respect to standard of *24 care, causation, breach, and damages, DRMC asserts that the evidence fails to support James’s theory that the standard of care required tPA to be administered upon his presentation to the ER at DRMC. However, DRMC’s argument on this issue fails to address that James asserted an alternative theory of negligence, separate and distinct from the issue of use of tPA, claiming that DRMC negligently breached the applicable medical standard of care by failing to administer supportive stroke treatment and by failing to admit him to the hospital for treatment and monitoring. The circuit court rested its decision on the failure to provide supportive care and the failure to admit James to the hospital for such supportive care and treatment, not upon the failure to administer tPA.
¶ 37. As acknowledged, DRMC attacks the scientific and medical bases of the circuit court’s opinion and judgment. We agree that in a case of medical malpractice, “a plaintiff is generally required to present expert medical testimony, first, identifying and articulating the requisite standard of care under the circumstances, and thereafter, establishing that the defendant physician or hospital failed in some causally significant respect to conform to the required standard of care.” Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss.1985). We further agree thát the Taylors bore the burden to prove the following essential elements of their medical-malpractice claim:[14] (1) the existence of a duty on the part of a physician to conform to the specific standard of conduct, (2) the applicable standard of care, (3) the physician’s failure to perform to that standard, (4) that thé breach of the duty by the physician was the proximate cause of the plaintiffs injury, and (5) that damages to the plaintiff resulted. See Patterson v. Tibbs, 60 So.3d 742, 753 (¶41) (Miss.2011); see also McGee v. River Region Med. Ctr., 59 So.3d 575, 578 (¶9) (Miss.2011). In order to prevail in a medial-malpractice action, a plaintiff must establish by expert testimony the standard of acceptable professional practice; that the defendant physician deviated from that standard; and that the deviation from the standard of acceptable professional practice was the proximate cause of the injury of which the plaintiff complains. McGee, 59 So.3d at 578 (¶ 9).
¶ 38. With respect to the Taylors’ burden of proof, they must show by a preponderance of the evidence the required elements of their medical-malpractice claim. See Mitchell v. Univ. Hospitals & Clinics-Holmes Cnty., 942 So.2d 301, 303 (¶ 8) (Miss.Ct.App.2006).[15] With respect to meeting this burden, DRMC argues that the Taylors failed to establish a national standard of medical care because the Taylors’ expert witnesses, Dr. Wiggins and Dr. Dyro, failed to identify sufficient data, research, treatises, or literature to support their expert opinions and testimony. See M.R.E. 702 (addressing standard for admissibility of expert testimony).
¶ 39. At trial, DRMC examined the Taylors’ experts regarding their deposition testimony, and DRMC objected to the admission of these experts’ opinion testimony. Consistent with their arguments now on appeal, DRMC asserted at trial that the Taylors’ experts could not support their *25 expert opinions with the requisite scientific data, research, or literature in accordance with Rule 702 and Daubert.[16] The circuit court, however, overruled the objections by DRMC related to the admission of the expert testimony of Dr. Wiggins and Dr. Dyro.[17]
¶ 40. In reviewing whether the circuit court erred in the admission of the testimony by the Taylors’ experts, Dr. Wiggins and Dr. Dyro, we acknowledge “[o]ur well-established standard of review for the trial court’s admission or suppression of evidence, including expert testimony, is abuse of discretion.” Tunica Cnty. v. Matthews, 926 So.2d 209, 212 (¶ 5) (Miss.2006) (citing McLemore, 863 So.2d at 34 (¶ 4)). Expert testimony should be admitted only if it satisfies Rule 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 41. Rule 702 sets forth two prongs for determining whether expert testimony should be admitted: (1) “the witness must be qualified by virtue of his or her knowledge, skill, experience[,] or education”; and (2) “the witness’s scientific, technical^] or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue.” See McLemore, 863 So.2d at 35 (¶ 7) (internal citations omitted). Further, supreme court precedent establishes that an expert witness must be qualified to render an opinion and that the expert testimony must be relevant and reliable. Watts v. Radiator Specialty Co., 990 So.2d 143, 146 (¶ 7) (Miss.2008) (citing McLemore, 863 So.2d at 35 (¶ 7)); see also Rebelwood Apartments RP, LP v. English, 48 So.3d 483, 494 (¶ 51) (Miss.2010) (“[A]n expert’s qualification and reliability of testimony are separate questions.”).
¶ 42. In Bailey Lumber & Supply Co. v. Robinson, 98 So.3d 986, 994-95 (¶ 23) (Miss.2012), the supreme court explained that party offering expert testimony “must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation.” The supreme court recognized its adoption of the Daubert standard for determining reliability, stating:
The Court in Daubert adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. The focus of this analysis ‘must be solely on principles and methodology, not on the conclusions [that] they generate.’ These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique’s operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
*26 Id. (citing McLemore, 863 So.2d at 36-37 (¶ 13)) (internal citations and quotations omitted).
¶43. We find instructive the supreme court’s analysis of reliability in Bailey Lumber. The court stated: “We find no evidence in the record that Dr. McNair [ (medical expert) ] consulted any literature, applied a particular theory, performed any procedures, or relied on any principles, methodologies, or scientific methods in concluding that the need for the hip replacement was a result of [the plaintiffs] fall....” Id.[18]
¶44. Qualification of the expert and the reliability of the expert’s testimony are separate questions. Therefore, we must determine if the experts’ testimony in this case lacked sufficient reliability, or stated otherwise, whether its admission rose to the level of an abuse of judicial discretion. In Hubbard ex rel. Hubbard v. McDonald’s Corp., 41 So.3d 670, 674 (¶ 14) (Miss.2010), the supreme court held that admission of expert testimony by the trial court will be affirmed absent abuse of judicial discretion. The Hubbard court further found that the expert physicians’ opinions were based on interpretation of the plaintiffs medical records in light of the experts’ experience, training, and expertise in the area, and the court found that the experts’ opinions therefore were sufficiently reliable and should have been admitted. Id. at 678 (¶ 29); see also Rebelwood Apartments, 48 So.3d at 494 (¶ 51). We additionally find instructive the supreme court’s analysis of reliability in Bullock v. Lott, 964 So.2d 1119, 1129 (¶ 30) (Miss.2007), where the supreme court ordered a new trial, finding that a witness “met the Daubert qualifications to testify as an expert in the fields tendered, [but] portions of [the] testimony were not based on sufficient facts or data.” Expert testimony must be relevant and based on fact. See Treasure Bay Corp. v. Ricard, 967 So.2d 1235, 1242 (¶29) (Miss.2007) (testimony “not based upon the facts [is] therefore unreliable”); Matthews, 926 So.2d at 213 (¶ 6); APAC-Miss., Inc. v. Goodman, 803 So.2d 1177, 1185 (¶ 30) (Miss.2002) (“ ‘[T]he facts upon which the expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture.’ ”) (citation omitted).
¶45. In McKee v. Bowers Window & Door Co., 64 So.3d 926, 932 (¶ 18) (Miss.2011), our supreme court again addressed reliability of expert testimony, recognizing that as to relevance, Mississippi Rule of Evidence 401 “favors admission of the evidence if it has any probative value,” and that “the threshold for admissibility of relevant evidence is not great.” See also Investor Res. Servs. v. Cato, 15 So.3d 412, 417 (¶ 6) (Miss.2009) (quoting McLemore, 863 So.2d at 40 (¶ 27)). Even though the threshold for relevance is low, the trial court in its gate-keeping role must also “examine the reliability” of the expert’s opinion. Janssen Pharmaceutica, Inc. v. *27 Bailey, 878 So.2d 31, 60 (¶ 135) (Miss.2004). The supreme court has further explained that:
In evaluating reliability, the court’s focus must be solely on principles and methodology, not on the conclusions that they generate. Expert testimony admitted at trial must be based on scientific methods and procedures, not on unsupported speculation or subjective belief.
McKee, 64 So.3d at 932 (¶ 18) (internal citations and quotations omitted).
¶ 46. To aid the trial court in determining admissibility of expert' testimony, the United States Supreme Court in Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786 adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. The Mississippi Supreme Court recognized that such factors include:
whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique’s operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
McLemore, 863 So.2d at 37 (¶ 13).
¶ 47. Our supreme court acknowledged that Rule 702 provides three requirements that were added after Daubert and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Hubbard, 41 So.3d at 675 (¶ 18). The Hubbard court explained that expert witnesses must base their expert testimony on sufficient facts or data; the testimony must be the result of reliable principles and methods; and the expert must have reliably applied these principles and methods to the facts of the case. Id. In accordance with precedent, we must determine whether the circuit court herein abused its discretion in the admission of the expert testimony of Dr. Wiggins and Dr. Dyro.
¶ 48. Instructive to our task, in Hubbard, the supreme court relied upon Poole v. Avara, 908 So.2d 716, 720-25 (¶¶ 2-18) (Miss.2005), in explaining that under our standards of admission of expert testimony, the law allows a qualified expert “to extrapolate causation testimony from the patient’s clinical picture” even when “the medical records contain no objective medical evidence establishing causation.” Hubbard, 41 So.3d at 678 (¶ 27). Significantly, the Hubbard court further found sufficient reliability, grounded in scientific medical theory of causation, in the expert testimony of a physician opining as to his interpretation of the plaintiffs medical records in light of his experience, training, and expertise as a qualified physician in the particular field of medicine. Id. at (¶ 29).
¶ 49. In further clarification of the illustrative purpose of the Daubert factors, in the recent case of Extension of Boundaries of City of Tupelo v. City of Tupelo, 94 So.3d 256, 269-70 (¶ 28) (Miss.2012), the supreme court again referred to its prior holding in Poole, 908 So.2d at 723 (¶ 14), wherein the court explained as follows:
[O]ur opinion in McLemore clearly states that ... the factors mentioned in Daubert do not constitute an exclusive list of those to be considered in making the determination^ rather] Daubert’s ‘list of factors was meant to be helpful, not definitive.’ [McLemore,] 863 So.2d at 39 (quoting Kumho Tire [Co. v. Carmichael], 526 U.S. [137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ]. Looking to the Fifth Circuit for guidance, the [McLemore ] [c]ourt re-emphasized that the Daubert list is illustrative, but is not exhaustive. [McLemore, 863 So.2d] at *28 38 (citing Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir.2002)). Mississippi is not unique in its interpretation of Daubert. The Daubert Court itself did not claim it was rigidly defining elements required for expert testimony to be admissible, but rather providing only “general observations” it deemed appropriate. [Daubert,] 509 U.S. at 593[ ], 113 S.Ct. 2786. Indeed[,] the Court stated, “Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test.” Id. A later look at Daubert by the U.S. Supreme Court provided the same result, concluding that “[w]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert. Too much depends upon the particular circumstance of the particular case at issue.” Kumho Tire, 526 U.S. at 150, 119 S.Ct. 1167.... That Court went on to state that “[i]t might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review.” Id. at 151, 119 S.Ct. 1167....
(Emphasis added).
¶ 50. In reviewing the merits of DRMC’s argument, we find that the record herein reflects that in support of their testimony, Dr. Wiggins and Dr. Dyro referred to widespread, recognized standards of medical care. Their testimony reflects general references to methods and procedures in widespread medical literature, the Tintinalli medical textbook, medical residency training,[19] and their experiences in widespread medical practices for stroke treatment and care in their respective fields.[20] Additionally, at trial, Dr. Dyro referred to a 1996 National Institute of Health article in support of her testimony.
¶ 51. A review of the record reflects no abuse of discretion in the circuit court’s admission of the expert testimony of Dr. Wiggins and Dr. Dyro, since these experts grounded their expert opinions and testimony upon James’s medical records, the methods and scientific principles taught in residency programs, and methods and principles instructed upon by medical texts, specifically the Tintinalli text. Additionally, the record reflects that Dr. Dyro and Dr. Wiggins applied the experience of their own practice of medicine in the pertinent fields, along with the widespread practice and application of emergency medicine. The testimony also shows that their expert opinions were supported by and consistent with medical literature, including a 1996 National Institute of Health article and an American Stroke Association article setting forth the standards of care for stroke patients. No testimony contradicts Dr. Wiggins’s reference to the medical Tintinalli text as a legitimate, scientific medical authority. No testimony contradicted Dr. Wiggins’s testimony that his opinion as to the standard of supportive stroke care was consistent with the standards established by the American Stroke Association. Additionally, no testimony contradicts Dr. Wiggins’s testimony *29 that he based his opinion regarding supportive stroke care upon methods and procedures taught by emergency-medicine residency programs and practiced with widespread acceptance in the field of emergency medicine.
¶ 52. In sum, the record reflects that Dr. Wiggins and Dr. Dyro based their expert testimony upon methods and procedures of medical science and not merely their subjective beliefs or unsupported speculation. We again acknowledge that in a bench trial, the trial judge enjoys great discretion with respect to the admission of evidence. Our review of the record of this bench trial reveals no abuse of discretion in the circuit court’s admission of the testimony of Dr. Wiggins and Dr. Dyro, the Taylors’ experts. Furthermore, we find nothing arbitrary or clearly erroneous in the circuit judge’s admission of the testimony of their testimony, since the record reflects evidence that their testimony was reliably grounded in scientific principals and methods, an emergency medicine text, residency training, widespread practices in emergency medicine, and that their testimony was consistent with the standards established by the American Stroke Association. See Hubbard, 41 So.3d at 674 (¶ 14) (citation omitted) (“A trial court’s decision to allow expert testimony will be affirmed ‘[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case.’ ”).[21]
¶ 53. In turning to examine whether the record contains substantial evidence supporting the circuit court’s judgment, opinion, and order, we find that James’s medical records, and the expert testimony of Dr. Wiggins and Dr. Dyro, along with other evidence in the record, provided such record support for the decision of the circuit judge. Moreover, the testimony of Dr. Wiggins and Dr. Dyro provided evidence establishing the applicable standard of care for supportive stroke care in this case for patients like James, displaying symptoms of a suspected CVA and having a differential, alternative potential diagnoses. As explained, Dr. Wiggins testified that the standard of care for ischemic-stroke patients requires admission to the hospital in order to provide these patients with supportive care and monitoring for the progression of symptoms, allowing physicians to respond as neurological trauma occurs to thereby prevent a worsening of the condition. Regarding causation between breach and damages, Dr. Wiggins also testified that in his expert opinion, to a medical certainty, had supportive stroke care been administered at DRMC when James displayed early potential CVA symptoms, then James would not have suffered the resulting debilitating conditions when he subsequently suffered a stroke.[22] In support of his opinion as to causation and damages, Dr. Wiggins explained that supportive care has shown effectiveness in stopping the progression of stroke symptoms like those suffered by James at DRMC, in contrast to thrombolytic agents like tPA, which are proved effective in reversing a stroke when administered appropriately. Dr. Dyro testified, consistent with Dr. Wiggins, that the standard of care in this case *30 required supportive care, admission to the hospital, and monitoring to allow a response with treatment and support, if needed.
¶ 54. A review of the evidence in the record shows substantial credible evidence supporting the circuit court’s judgment, opinion, and order. See Pilgrim Rest, 835 So.2d at 74-75 (¶ 18); MacDonald, 698 So.2d at 1084 (¶ 25); Blackston v. George Cnty., 102 So.3d 1182, 1187 (¶ 23) (Miss.Ct.App.2012) (In a bench trial, the judge acts as the jury for purposes of resolving factual issues). We therefore affirm the circuit court’s judgment.
¶ 55. THE JUDGMENT OF THE WASHINGTON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, RUSSELL AND FAIR, JJ„ CONCUR. MAXWELL, J„ CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. See Miss.Code Ann. § 11-46-13(1). DRMC is a political subdivision of the State of Mississippi, and thus is entitled to the limitations, protections, and immunities of the MTCA; therefore, this case was tried without a jury.

. The record reflects that James was fifty-seven years old at the time he presented to DRMC's ER.

. CVA is a medical acronym for cerebral vascular accident, http://www.mdguidelines.com/ cerebrovascular-accident/definition.

.In the initial complaint, the Taylors claimed that James received treatment from Dr. Clive Sherrod while at the ER at DRMC. The Tay-lors filed an amended complaint, correcting the facts to reflect that Dr. O’Neal, not Dr. Sherrod, actually treated James.

. Consistent with the basis for expert opinions disclosed by the Taylors on May 4, 2011, the amended complaint set forth a list of alleged negligent acts and breaches of the standard of care, including failure to properly diagnose and treat James, failing .to conduct and order proper diagnostic testing, and failure to consult a neurologist.

. The parties both called Dr. James Warring-ton, James's primary care physician, as a witness. Dr. Warrington testified via deposition.

. The record reflects that the curriculum vi-taes of Dr. Wiggins and Dr. Dyro were admitted into evidence at trial; however, the deposition testimony of Dr. Wiggins and Dr. Dyro was marked for identification purposes only. At trial, the transcript reflects that counsel for DRMC questioned the experts regarding their deposition testimony and also quoted excerpts from their deposition testimony.

. Dr. O'Neal did not testify at trial, but he was deposed. Dr. O’Neal’s medical records regarding James were admitted into evidence at trial.

. The record reflects that this article was marked prior to trial by agreement of the attorneys. The article was listed as defense exhibit ten, and the record states that the article was entered into evidence for identification only.

. The trial transcript reflects that the following witnesses provided testimony at trial: Dr. Wiggins, Tommy Lee Johnson Jr. (Eva’s son, James’s stepson), Gwendolyn Rice (Eva’s daughter, James’s stepdaughter), Dr. War-rington (via deposition testimony), James, Dr. Dyro, Eva, Dr. Carlton, Dr. Chandler, and Amy Dowdy (designated corporate representative of DRMC).

. See also Carpenter v. Beiry, 58 So.3d 1158, 1161 (¶¶ 13-14) (Miss.2011); Gulf Coast Research Lab. v. Amaraneni, 722 So.2d 530, 535 (¶ 19) (Miss.1998).

. Patterson v. Tibbs, 60 So.3d 742, 753 (¶ 41) (Miss.2011); Nichols v. Moses, 859 So.2d 1042, 1044-45 (¶ 9) (Miss.Ct.App.2003); see also Mitchell v. Univ. Hospitals & Clinics-Holmes Cnty., 942 So.2d 301, 303 (¶ 8) (Miss.Ct.App.2006) (The plaintiff must show by a preponderance of the evidence the required elements of a medical-malpractice claim.).

. See M.R.E. 702.

. Miss.Code Ann. § 11-46-13(1).

. DRMC's brief cites to Rule 52(a) as setting forth the standard of review for bench trials in MTCA cases. However, Rule 52(a) addresses the trial court’s duty to find facts specially and provide conclusions of law separately upon request of a party, as discussed in this opinion and relevant case law. See Tricon Metals, 516 So.2d at 239 (Miss.1987).

. See Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786.

. See M.R.E. 702; M.R.E. 703 cmt. (explaining the possible sources that may produce an expert’s facts or data, including personal observation).

. See also Troupe v. McAuley, 955 So.2d 848, 856 (¶ 22) (Miss.2007). In Troupe, the supreme court held that a physician does not have to be a specialist in every area in which he offers an opinion, but he must demonstrate that he is “sufficiently familiar with the standards” in that area. Id. The supreme court later clarified that “only if the witness possesses scientific, technical, or specialized knowledge on a particular topic will he qualify as an expert on that topic.” Worthy v. McNair, 37 So.3d 609, 616 (¶ 23) (Miss.2010) (citations omitted). Additionally, Braswell v. Stinnett, 99 So.3d 179, 184 (¶ 9) (Miss.Ct.App.2011), this Court reiterated that “Mississippi physicians are bound by nationally-recognized standards of care; they have a duty to employ 'reasonable and ordinary care' in their treatment of patients.” See also Palmer v. Biloxi Reg'l Med. Ctr., Inc., 564 So.2d 1346, 1354 (Miss.1990).

. Dr. Wiggins and Dr. Dyros’s resumes were admitted into evidence, and they were voir dired as to their credentials. Dr. Wiggins attended New York Medical College and completed his residency training at Kern Medical Center in Bakersfield, California. Dr. Dyro attended medical school at the University of Maryland and completed her residency training at Johns Hopkins University.

. In comparison to the testimony herein, in Sherwin-Williams Co. v. Gaines ex rel. Pollard, 75 So.3d 41, 46 (¶¶ 15-16) (Miss.2011), the supreme court found the expert testimony of two doctors speculative and inadmissible where the experts failed to present any scientific authority.

. See also Anderson v. State, 62 So.3d 927, 938 (¶ 32) (Miss.2011). In Anderson, a criminal case, the supreme court addressed the nonexclusive list of Daubert factors and cited Poole, 908 So.2d at 721 (¶ 8), in recognizing that a trial court’s decision to admit expert testimony should be upheld on appellate review unless the appellate court finds that the decision was arbitrary and clearly erroneous.

. See Bubb v. Brusky, 321 Wis.2d 1, 768 N.W.2d 903, 922-24 (¶¶ 71-74) (Wis.2009).