# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-SA-01131-COA

**CHARLES CARTER**                                                                                    **APPELLANT**

**v.**

**THE STATE OF MISSISSIPPI, MISSISSIPPI**                                         **APPELLEES**
**DEPARTMENT OF TRANSPORTATION AND**
**SECRETARY OF STATE FOR THE STATE OF**
**MISSISSIPPI**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/05/2024 |
| TRIAL JUDGE: | HON. CHARLES W. WRIGHT JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT KEVIN HAMILTON |
| ATTORNEY FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL BY: STEVEN D. SLADE |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED, RENDERED, AND REMANDED - 05/12/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

¶1.     After a bench trial in a Mississippi Tort Claims Act (MTCA) case, the circuit court entered a judgment in favor of the State Defendants, and Plaintiff Charles Carter appealed. Finding that the circuit court erred, we reverse the judgment, render a verdict in favor of Carter, and remand the matter to the circuit court for entry of a judgment consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶2.     On October 25, 2019, a dead tree located at 3810 Royal Road in Meridian,

Mississippi, fell onto Carter's moving vehicle and smashed in its roof, resulting in serious and permanent injuries to Carter. The tree was located on property owned by the State of Mississippi, which had acquired title to the subject property in 2016 due to the non-payment of taxes.

¶3. Carter filed a complaint on March 23, 2021, against Defendants State of Mississippi, Mississippi Department of Transportation, the Secretary of State for the State of Mississippi, the City of Meridian, and John Does 1-3. In the complaint, Carter alleged that a dead tree on the State-owned property fell onto his vehicle while he was driving down the road, and as a result, he sustained serious and permanent injuries.[1] According to the complaint, "the existence of a large dead tree immediately adjacent to the roadway" presented "an unreasonable risk of danger to the public," and "the tree, in the condition that it was in on the date of the incident, constituted a dangerous condition." Carter also asserted that "[a]s owners of the property, the State Defendant(s) had a duty to remove dangerous conditions that presented a risk of harm to the general public while traveling on the street adjacent to the property," and he contended that "it was reasonably foreseeable that to allow such a condition to continue to exist created a foreseeable risk of injury to the public." Carter claimed that "[a]llowing a dead tree to remain on the State Defendant(s)' property once it had actual or constructive notice constituted negligence on the part of the State Defendant(s)."

¶4. In addition to the claims of a "dangerous condition," Carter argued that the defendants were liable on the basis of negligent inspection and maintenance. He alleged that "had the

---

[1] On June 27, 2024, the circuit court granted the City of Meridian's motion for entry of a final judgment and dismissal, and the City is not a party to this appeal.

State Defendant(s) acted with reasonable care and prudence in inspecting its property that abutted the roadway that was traveled by the public, it would have been apparent that the tree in question was dead and was dangerous to the public." He claimed that "the condition had existed for a sufficient amount of time such that constructive notice existed as to the dangerous and defective condition," and "[h]ad reasonable diligence been exercised, the existence of this dead tree would have been ascertained and the danger could have been remedied."

¶5. In the pretrial order, the Defendants argued that they had not breached any duty with regard to Carter, and "there arose no obligation to maintain that property upon any State-level entity to maintain the parcel in tax-default or to warn of any dangerous condition." In fact, in the pretrial order, the Defendants stipulated, in part, as follows:

A. The tree at issue was dead on the date of the incident.

B. The tree at issue was located entirely on property owned by, and titled in the name of, the State of Mississippi on the date of the incident.

C. The parcel of property where the tree was located was titled in the name of the State of Mississippi beginning in August of 2016.

D. The State of Mississippi did not visit, inspect, or perform any maintenance on the property at 3810 Royal Road from the time that it acquired title to the property until the time that it subsequently conveyed the property, which occurred at some point after this incident occurred.

The State also stipulated that Carter suffered damages in an amount exceeding the statutory maximum of $500,000.00, pursuant to Mississippi Code Annotated section 11-46-15(1)(c) (Rev. 2019).

3

¶6.     A bench trial was held on August 27-28, 2024. Carter testified that he was driving home down Royal Road, when "the next thing I remember was a 'boom.' When I came to, I just had a tree in my face." Carter told the court that he did not see or hear anything that would warn him the tree was falling on him. He testified that the "top 25, maybe 30 feet of the tree is what actually hit the car." The car had to be cut open for emergency workers to get Carter out of the car. According to Carter, the tree fell from the direction of the passenger side of his vehicle. Carter further testified that he could not have seen the dead tree because, from the direction he was traveling, his view was blocked by a "big green tree." According to Carter, a young man was trying to help him and asked him to put the car in park. Carter stated, "I couldn't move. I was paralyzed. The dashboard, the steering wheel and everything was in my lap, including the tree. So after that, I - - I couldn't move, I couldn't say anything until maybe about two hours after I was at the hospital." He communicated with paramedics by blinking his eyes. Carter was taken to the University of Mississippi Medical Center in Jackson, where he stayed for about two weeks. Once released, Carter was bedridden for a month and a half. He needed assistance to do almost anything for about three to four months.[2]

¶7.     Jeremy Stokes testified on Carter's behalf as an expert in the field of forestry. As part of his routine practice, Stokes searched for available aerial images of the property through Google Earth and other services. Stokes located a 2009 image of the property at issue that showed the tree in question was alive and well at that point in time. The 2009 image showed

---

[2] Since the Defendants stipulated to the amount of Carter's damages, we will not go into the details of Carter's injuries, treatments, and damages.

4

a large green crown that was extending over the adjacent roadway. Stokes then showed the court another image, from 2015, that showed that the tree still had a large crown that extended over the roadway, but the tree was dead. Stokes testified that had the State inspected the property at the time it took ownership in August 2016, the dead tree could have been easily discovered by a visual inspection of the property or by using the same aerial images that he had shown to the court. Stokes stated that Google Earth and similar services are free to the public and would have been available to the State. Had the State discovered this large dead tree adjacent to the road and conducted a proper risk assessment analysis, Stokes testified that in his expert opinion, the only available remedy would have been the immediate removal of the tree.

¶8. Carter rested his case, and the defense moved for a directed verdict or summary judgment, which the circuit court denied. The State's first witness was William Cheney Jr., the Assistant Secretary of State for Public Lands since 2016. He stated that the Secretary of State's Office and his division "maintain[s] an inventory of" tax-forfeited parcels and "work[s] on getting those back into the stream of commerce, basically getting off our [rolls], sold and back to the -- back into private ownership." He testified, "Currently, statewide we have approximately 7,000 parcels of tax-forfeited land," and he supervises only nine employees;[3] so the State "do[es] not have personnel to do property inspections" of tax-forfeited properties. Cheney explained:

---

[3] Cheney noted that "of the nine employees, one is historical records, one is a senior attorney, two are data-entry analysts, and then the other four, the other five handle tax-forfeited throughout the state, but we do not have any field personnel or anybody to go examine property."

5

> [W]e do no maintenance. So how they're maintained generally is the – if it's in a municipality, it's the code enforcement officer or if it's the county, sometimes the supervisor will call us and say, you know, well, this property, the grass is overgrown or it's kind of trashy. Will you grant us a right of entry so we can go cut the grass or pick up the trash [b]ut it's all local – it's all local. We do not do anything directly.

When asked about a land-records maintenance fund, Cheney noted that "since 2016, the legislature has not placed any money in that fund."[4] He noted, "I'm not aware of any statute that requires a governmental entity to maintain our property."

¶9. John Franklin, the assistant maintenance engineer for several counties under the control of MDOT's District 5 since 2020, testified on MDOT's behalf. Franklin testified that MDOT is "responsible for maintaining the roadways and right-of-ways of all state routes . . . owned and governed by the [MTC]." However, when counsel asked where his duties extended to the maintenance of municipal roadways not owned by the MTC, Franklin stated, "There really aren't any. We - - we are governed by the law. We're not allowed to do that." Franklin testified that although there are procedures by which a municipality might ask for MDOT's assistance in maintaining a certain municipal route, he said that it happens so rarely

---

[4] Mississippi Code Annotated section 29-1-145(2) provides:

> The Secretary of State is authorized to use, *upon appropriation by the Legislature*, any monies deposited into the Land Records Maintenance Fund to contract with a vendor in accordance with state competitive bidding process to maintain unredeemed lands sold for taxes while those lands remain unsold and lands sold for taxes that have been certified to the state. For purposes of this section, the term "maintain" means cutting grass, trees and/or limbs, or repairing, clearing or demolishing structures and/or cleaning rubbish and debris.

Miss. Code Ann. § 29-1-145(2) (Supp. 2025) (emphasis added).

that he has never dealt with that circumstance during his fifteen years on the job. When asked specifically about the extent of MDOT's maintenance jurisdiction over properties alongside Royal Road, where the subject parcel was located, Franklin responded, "None whatsoever."

¶10. On September 5, 2024, the circuit court entered a judgment in favor of the Defendants, concluding that none of the State entities "held any duties to Plaintiff that were breached, statutorily or otherwise." Carter appeals from the circuit court's September 5, 2024 order.[5]

## STANDARD OF REVIEW

¶11. In *Luckett v. Leake County*, 428 So. 3d 485, 493 (¶19) (Miss. Ct. App. 2026), we stated:

> This Court affords a circuit court sitting without a jury "the same deference with regard to factual findings" as we do a chancery court. *Holstein v. Nicholas*, 399 So. 3d 959, 963 (¶9) (Miss. Ct. App. 2025). "When reviewing the factual findings of the circuit court sitting as the sole trier of fact in a bench trial, we apply the substantial-evidence standard of review." *Id.* (quoting *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 23 (¶35) (Miss. Ct. App. 2012)). However, "errors of law, which include the proper application of the Mississippi Tort Claims Act," are reviewed de novo. *Univ. of Miss. Med. Ctr. v. Aycock*, 369 So. 3d 534, 538 (¶14) (Miss. 2023) (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 908 (¶4) (Miss. 2000)).

---

[5] Carter also appeals the court's June 27, 2024 order denying his motion for summary judgment. However, "appeals from the denial of a motion for summary judgment are interlocutory in nature and are rendered moot by a trial on the merits." *Miss. Bureau of Narcotics v. Hunter*, 311 So. 3d 629, 635 (¶22) (Miss. Ct. App. 2020); *see also Gibson v. Wright*, 870 So. 2d 1250, 1254 (¶8) (Miss. Ct. App. 2004) (recognizing that "once trial begins, summary judgment motions effectively become moot"). Therefore, because the circuit court entered a judgment after a bench trial on the merits, we find the court's June 27, 2024 order denying Carter's summary-judgment motion is not reviewable on appeal.

## ANALYSIS

¶12.    In rendering its judgment in favor of the Defendants, the circuit court found that it was undisputed that the State was not notified of any dangerous condition on the parcel of land prior to Carter's injury.  The court found that there was no evidence that the State had the opportunity to warn Carter of the hazard.  The court further found that the State was entitled to immunity pursuant to Mississippi Code Annotated section 11-46-9(1)(v) (Rev. 2019) because there was no evidence that State employees had "actively created the danger[ous] condition (i.e., [that] they had actual or constructive notice of the hazard) 'and' had the opportunity to correct or warn against it but did not."  Finding Carter "failed to prove liability based on the 'dangerous condition' exception of [section] 11-46-9(1)(v)," the court determined:

> There is no statute, rule, regulation or order that compels the State or its employees to inspect every existing tree alongside its highways in carrying out that plan.  It is undisputed in this case that the tree in question was not situated on a State highway or roadway.  No State entity has been shown to have had any prior notice of any dangerous condition on the tax-forfeited property.  Plaintiff has not proven the State's creation of any dangerous condition.

> Based on the above analysis, Plaintiff failed to prove by a preponderance of the evidence the liability of Defendants based on negligent inspection and negligent maintenance of the property.

As will be discussed below, we find that the circuit court erred as a matter of law by finding that the State had no duty to inspect and maintain its property.  We further find that the court was manifestly wrong in its factual finding that the State did not have constructive notice of the hazard presented by the huge dead tree on its property overhanging the roadway.

¶13.    The court acknowledged in its "Order and Decision" that Carter cited authorities for

8

his contention that the State had the same duty as a private business owner to inspect and maintain its property in a reasonably safe condition and his contention that the State had constructive notice of the hazard. The court's order recognized that Carter had cited *Miller v. City of Gulfport*, 323 So. 3d 1117 (Miss. Ct. App. 2021), in support of his claim.

¶14.    In *Miller*, the City of Gulfport owned a facility called the SportsPlex, which the City leased to Shoemaker. *Id*. at 1119 (¶2). While attending a baseball tournament at the SportsPlex, Miller stepped into a hole and fell. *Id*. at (¶3). As a result of the fall, Miller required medical attention. *Id*. Miller filed a premises liability action against both the City and Shoemaker. *Id*. at (¶4). After engaging in discovery, the defendants moved for summary judgment. *Id*. The trial court granted the motion for summary judgment, finding that Miller had not met her burden of proof to succeed on any of the three methods available to establish liability on the part of Shoemaker or the City.[6] *Id*. at 1119-20 (¶5).

¶15.    On appeal, Miller argued that genuine issues of material fact had been established to

---

[6] This Court described that plaintiff's burden in a premises liability claim in *Walz v. HWCC-Tunica Inc.*, 186 So. 3d 375, 377 (¶9) (Miss. Ct. App. 2016), which is also applicable here:

> To succeed in a premises-liability claim, the plaintiff must show: "(1) a negligent act by the defendant caused the plaintiff's injury; **or,** (2) that the defendant had actual knowledge of a dangerous condition, but failed to warn the plaintiff of the danger; **or**, (3) the dangerous condition remained long enough to impute constructive knowledge to the defendant." *Byrne v. Wal-Mart Stores Inc.*, 877 So. 2d 462, 465 (¶5) (Miss. Ct. App. 2003) (citing *Downs v. Choo*, 656 So. 2d 84, 86 (Miss. 1995)). Each of these premises-liability claims requires that the party show a dangerous condition existed. *Garson v. Circus Circus Miss., Inc.*, 135 So. 3d 932, 934 (¶9) (Miss. Ct. App. 2014).

(Emphasis added).

show that the defendants' negligence caused her injuries. *Id*. at (¶9). Shoemaker and the City argued that the dislodged cover did not constitute an unreasonably dangerous condition. *Id*. at 1120 (¶8). However, this Court found that the description of the hole in question was described in numerous ways by the parties, and the size of the hole was reported to be bigger than a coffee cup but smaller than a plate. *Id*. at 1121 (¶8). There was also testimony that the hole was about twelve inches in diameter. *Id*. As a result, this Court found, given the various descriptions of the hole, that the court could not classify it as a "common architectural condition" and rejected this argument. *Id*.

¶16.    In rendering its decision in *Miller*, this Court explained:

> Miller does not claim that Shoemaker or the City had actual or constructive knowledge of the allegedly dangerous condition. As [this] Court held in *McCullar* [*v. Boyd Tunica Inc.*], 50 So. 3d [1009,] 1012 (¶16) [(Miss. Ct. App. 2010)], "[a]ctual or constructive knowledge of a dangerous condition is not a required element of proof in a premises-liability case where a business owner's negligence caused the danger." Instead, Miller claims that Shoemaker or the City were negligent in failing to inspect the walkway and that had the walkway been inspected as required, the allegedly dangerous condition would have been found. This argument is in line with the Mississippi Supreme Court's holding in *Jones v. Imperial Palace of Mississippi, LLC*, 147 So. 3d 318, 321 (¶13) (Miss. 2014), that "[w]ithin a premises owner's duty to keep the premises reasonably safe is included a duty to conduct reasonable inspections."
>
> In support of her argument that Shoemaker and the City's failure to inspect the walkway constitutes negligence, Miller relies on *Moore v. Winn-Dixie Stores Inc.*, 252 Miss. 693, 173 So. 2d 603 (1965). However, her interpretation of *Moore* is flawed. In *Moore*, the Mississippi Supreme Court stated that "[t]he mere existence of a defect or danger is not enough to establish liability, unless it is shown to be of such a character or of such a duration that the jury may reasonably conclude that due care would have discovered it." *Id*. at 699, 173 So. 2d at 605. "Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists." *Coleman v. Smith*, 914 So. 2d 807, 813 (¶15) (Miss. Ct. App. 2005) (quoting *Foldes v. Hancock Bank*, 554 So. 2d 319, 321 (Miss.

1989)). Miller has provided no evidence that reasonable inspections by the City or Shoemaker would have revealed the dislodged cover.

*Miller v. City of Gulfport*, 323 So. 3d 1117, 1121 (¶¶9-10) (Miss. Ct. App. 2021). Based upon this holding, the State has the same duty to maintain and inspect its property as any other premises owner.[7] Further, *Miller* makes it clear that it was not necessary for Carter to show that the State had actual or constructive knowledge of the dangerous condition because he alleged that their negligence caused the dangerous condition to exist.[8]

¶17. In any event, the *Miller* decision rested on the finding that Miller had not shown how or when the cover to the hole became dislodged. Because there was no proof that the dangerous condition would have been discovered upon a reasonable inspection our Court affirmed the order granting summary judgment. *The same is not true in the present case.*

¶18. In the case at hand, the circuit court had the benefit of expert testimony in the field of

---

[7] *See Mizell v. Cauthen*, 251 Miss. 418, 426, 169 So. 2d 814, 816-17 (1964):

We are of the opinion and so hold that the defendant landowner was under the duty of using reasonable care to prevent his property, which abutted the public way, from becoming a source of danger to the persons using the same. This is in accord with the general rule stated in 65 C.J.S. Negligence § 79 (1950), 'Tress. An owner of land who permits a tree to remain thereon near the public highway is under a legal obligation to take reasonable care that it shall not fall into the highway and injure persons lawfully there.' And, 25 Am. Jur. Highways § 490 (1940), page 778, wherein it is stated, 'With respect to the liability of an abutting owner, the rule in most jurisdictions is that he must exercise reasonable care to prevent injury to travelers from trees, which are under his ownership and control, standing in or along a street or other highway.'

[8] While the State's liability could be based upon the theory that its negligence caused the dangerous condition, as will be discussed below, we also find that the proof shows that the State had constructive knowledge of the dangerous condition and failed to remedy the situation.

11

forestry, as well as aerial maps of the tree dating back to 2009. Jeremy Stokes testified that as an expert in his field, he routinely searches for available aerial images of property using Google Earth and other similar services. Stokes also testified that these services are free and would have been available and easily accessible to the State to assist in property maintenance. Stokes testified that a 2009 aerial image of the property showed that the tree was green and alive. However, a 2015 image of the tree clearly showed that the tree that ultimately fell on Carter's car was dead. According to Stokes, had the State taken advantage of any of the services that provide aerial landscape photography, it would have known of the potential risk when it gained possession of the property in 2016. Finally, Stokes testified that had the State been aware of the potential hazard caused by the presence of the dead tree, and had the State conducted a risk assessment analysis, the only available solution would have been immediate removal of the tree.

¶19. Based upon the State's stipulations set forth above and Stokes' testimony, we find the State failed in its duty to keep its property in a "reasonably safe condition" and to "conduct reasonable inspections" of the property to locate and remove the unreasonably dangerous condition presented by this huge dead tree located adjacent to and overhanging the roadway.

¶20. This same evidence supports a finding that the State had constructive notice of the danger that the dead tree overhanging the roadway presented to passing motorists and members of the general public. Stokes' testimony and exhibits showed that the tree was alive in 2009, but it was dead by 2015. The State obtained title to the property in August 2016. A large portion of the dead tree fell on Carter in October 2019, over three years after the

12

State acquired title to the property.

¶21.    In *City of Hattiesburg v. Hillman*, 222 Miss. 443, 451, 76 So. 2d 368, 371 (1954), a two-and-a-half-year-old child was killed when she was struck by a 200-pound limb that fell off a tree that was adjacent to a city street.  The proof showed that the tree had been dead for nearly two years.  At trial, the city was found liable, and the child's estate was awarded damages in the amount of $10,000.  In affirming the trial court's judgment, the Mississippi Supreme Court stated:

> Her death was the proximate result of the failure of the city to remove a dead and dangerous tree from its street when it knew, or by the exercise of reasonable care ought to have known, of the potential danger.

(Citations omitted).  The court found that two years were sufficient for the dead tree to be discovered and removed.  Under the facts in this case, we find that three years were more than sufficient time for the State to have discovered and removed the dead tree that struck Carter.

¶22.    As to immunity provided to governmental entities by the Mississippi Tort Claims Act, Mississippi Code Annotated section 11-46-9(1)(v) provides:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
>
> . . . .
>
>> (v) Arising out of an injury caused by a dangerous condition on property of the governmental entity that was not caused by the negligent or other wrongful conduct of an employee of the governmental entity or of which the governmental entity did not have notice, either actual or constructive, and adequate opportunity to protect or warn against; provided, however, that a governmental entity shall not be liable for the failure to warn

of a dangerous condition which is obvious to one exercising due care[.]

It is clear that the dangerous condition in this case was caused by the State's failure to inspect its property and maintain it in a reasonably safe condition. The proof also shows that the State had constructive knowledge of the dangerous condition. As a result, there is no immunity available to the State.[9]

**CONCLUSION**

¶23.   We reverse the trial court's judgment in favor of the State Defendants and render judgment in favor of Carter. We remand the matter to the circuit court to enter a judgment in favor of Carter. Because the State stipulated to Carter's damages in an amount exceeding the statutory maximum pursuant to Mississippi Code Annotated section 11-46-15(1)(c), the circuit court's judgment shall include an award of damages to Carter in the amount of $500,000.00.

¶24.   **REVERSED, RENDERED, AND REMANDED.**

   **CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY AND WEDDLE, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. BARNES, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND LASSITTER ST. PÉ, JJ.; McDONALD, J., JOINS IN PART.**

   **BARNES, C.J., DISSENTING:**

---

[9] The dissent suggests that this decision "places a heavy burden on the State that is not imposed by either statute or common law." However, as discussed above, the burden to inspect and maintain publicly owned land in a reasonably safe condition has been in place for decades. The exception from sovereign immunity relied upon in this case has been in place for decades, along with a $500,000.00 cap on damages. How the State elects to meet its obligation to protect the public from dangerous conditions on state-owned lands is up to the State.

¶25. The majority places a heavy burden on the State that is not imposed by either statute or common law. Accordingly, I respectfully dissent.

¶26. Unlike the average person purchasing property in the open market (or bidding on property for a tax sale), the State has no discretion in its acquisition of these properties. In his Rule 30(b)(6) deposition,[10] William Cheney Jr., Assistant Secretary of State for Public Lands, testified:

> By statute[,] property is taxed ad valorem taxes[;] they are to be paid every year. If they're not paid then that property goes for sale at the courthouse steps.[11] Two things occur; an individual buys it or no one buys it. If no one buys it, it becomes titled in the name of the State subject to the individual's right to redeem it.
>
> After two years if that individual has not redeemed it, then on that third August, the clerk, the chancery clerk will certify that property to the State. At which time it becomes in our inventory.
>
> We verify that the certificate from the county is correct, place the property in our inventory and then it goes on our website for sale.
>
> . . . .
>
> For that period of time when it's titled in the State but there is the right of redemption, *it's titled in the State really in name only.* We have no access to it. We have no right to it. So the -- *whatever occurs on it, it might be on the books for the State, but we don't have title to it. So anything could occur on the property potentially, because we don't really have ownership of it yet.*
>
> . . . .
>
> But that two-year, for lack of a better term, limbo before we get the certificate, we don't -- that is part of the process. But we don't know of that property until

---

[10] *See* M.R.C.P. 30(b)(6).

[11] *See* Miss. Code Ann. § 27-41-15 (Rev. 2024) (discussing the tax sale procedure upon default).

15

we get the certificate. It might be in our name and so that is part of the process. But for that two year, during the right of redemption period, we have no idea what's going on on that property.

(Emphasis added).[12] Cheney's testimony aptly summarizes the statutory provision regarding lands sold by tax sale or "struck off," as provided (in part) in Mississippi Code Annotated section 27-41-81 (Rev. 2024):

> The tax collector shall on or before the first Monday of June transmit to the clerk of the chancery court of the county separate certified lists of the lands struck off by him to the state and that sold to individuals, specifying to whom assessed, the day of the sale, the amount of taxes for which the sale was made and each item of cost incidental thereto, and, where sold to individuals, the name of the purchaser, to be separately recorded by the clerk in books kept by him for that purpose. Except as otherwise provided in Section 27-41-59, the lists **shall vest in the state or the individual purchaser thereof a perfect title to the land sold for taxes, but without the right of possession and subject to the right of redemption**; but a failure to transmit or record a list, or a defective list, shall not affect or render the title void.

Miss. Code Ann. § 27-41-81 (emphasis added). Thus, the State did not have a right of possession until approximately one year prior to Carter's accident; nor did the State have the right to refuse the property.

¶27. As the Appellees reason, these tax-forfeited properties "are most likely blighted long before" they are placed under the State's control, and with only nine employees assigned to these properties, "it is clear that the Legislature has not intended for the Public Lands division to be responsible for inspecting (let alone maintaining) each property." This reasoning is supported by Cheney's testimony explaining that the "goal" for these tax-forfeited lands is to return them "back into productive use" and that the State does not have

---

[12] Thus, Cheney noted that the State would not have gotten the certificate until 2018.

16

the personnel to conduct inspections or maintenance on the thousands of tax-forfeited parcels throughout the state.

¶28. Furthermore, Carter has not cited any applicable statute, rule, or regulation imposing a duty on the State to perform routine inspections and maintenance on tax-forfeited parcels, and Cheney testified that he was "not aware of any statute that requires a governmental entity to maintain our property." Rather, the State's evidence demonstrated that there was an *unwritten* policy to rely on the local authorities to note any potential issues *and take care of any maintenance, if needed.*

¶29. I further find that imposing the concept of constructive notice and a duty to maintain these lands on the State Defendants has not been justified. Carter has not established that the tree's condition "existed for such a length of time" that the Secretary of State should have been aware of it "*through the exercise of reasonable care.*" *See Parson v. Go Knightrider LLC*, 282 So. 3d 609, 615 (¶20) (Miss. Ct. App. 2019) ("Constructive knowledge is established where the condition is shown to have existed for such a length of time that the operator, *through the exercise of reasonable care*, should have known of its existence.").

¶30. Although Carter's expert witness, Jeremy Stokes, testified at trial that Google Earth aerial photographs from 2015 showed that the subject tree was visibly dead, this Court has recently characterized Stokes's use of five-year-old photographs using Google Earth images as a "less-than-optimal method of assessing the [tree] limb's health status at the time of the accident." *Allred v. Tishomingo County*, 411 So. 3d 1104, 1121 (¶52) (Miss. Ct. App.

2024).[13]  We noted in *Allred* that "Stokes was the only other witness to testify that the tree limb was probably dead at the time of the accident.  But he never saw the limb or tree, and he only viewed pictures of them to give his opinion that the tree and limb were dead."  *Id*. at 1119 (¶44).  Likewise in the present case, Stokes opined—using this "less-than-optimal method" of viewing five-year-old Google Earth images and without inspecting the property personally—that the tree was visibly dead and an "[e]xtreme danger."

¶31.    Cheney testified at trial that the Secretary of State had approximately 7,000 parcels of tax-forfeited lands.  With only nine employees and no "field personnel or anybody to go examine property," he explained that the State generally relies on local authorities to provide his division with notice of any dangerous condition.  Cheney noted that his office only receives "three to four calls a year" about property "damage to a fence or a tree down in someone's backyard," but this was "the first physical injury . . . that I'm aware of, or my staff can seem to recall."  Based on our holding in *Allred* and the evidence presented at trial, I agree with the circuit court's finding that none of the State Defendants had notice, "either actual or constructive," of a dangerous condition on the subject property.

¶32.    Accordingly, I would affirm the circuit court's judgment.

**WESTBROOKS AND LASSITTER ST. PÉ, JJ., JOIN THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**

---

[13] We also noted that the expert for Tishomingo County "testified that assessing a tree's health from photographs over five years old is not an acceptable methodology in the field."  *Allred*, 411 So. 3d at 1121 (¶52).